IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DISABILITY RIGHTS PENNSYLVANIA,           Civil Action No:

        Plaintiff,

    v.

PENNSYLVANIA DEPARTMENT
OF HUMAN SERVICES,
TERESA MILLER, in her
official capacity as Secretary
of the Department of Human
Services, CHARLES NEFF, in his
official capacity as Director
of the Pennsylvania
Bureau of Juvenile Justice Services,
JOHN BOYER, in his official capacity
as Director of Loysville Youth
Development Center, JENNY
NAUGLE, in her official capacity
as Director of Loysville Youth
Development Center, KEITH A.
STUCK, in his official capacity
as Director of North Central Secure
Treatment Unit Boys' Program,
KEVIN SEABROOK, in his
official capacity as Director of
North Central Secure Treatment Unit
Girls' Program, KRISTOPHER REED
in his official capacity as Director of
South Mountain Secure Treatment
Unit, RANDELL SWANK, in his
official capacity as Youth
Development Counselor Supervisor,
at North Central Secure Treatment
Unit, RANATTA KNITTLE, in her

**official capacity as Youth** :
**Development Aide Supervisor at** :
**North Central Secure Treatment Unit,** :
**VERONICA MOORE, in her official** :
**capacity as Youth Development Aide** :
**at North Central Secure Treatment** :
**Unit, DORENE McDONALD, in her** :
**official capacity as Youth** :
**Development Aide at North Central** :
**Secure Treatment Unit, TIMOTHY** :
**SEBASTIAN in his official** :
**capacity as Youth Development** :
**Counselor Supervisor at North** :
**Central Secure Treatment Unit, and** :
**JOHN DOE 1-10,** :
                                          :
       **Defendants.** :
                                          :
                                          :
_____ :

## COMPLAINT

Plaintiff Disability Rights Pennsylvania ("DRP") brings this action

against Defendants Pennsylvania Department of Human Services ("DHS"),

Teresa Miller, Secretary of DHS, Charles Neff, Director of Pennsylvania's

Bureau of Juvenile Justice Services, John Boyer and Jenny Naugle,

Directors of Loysville Youth Development Center, Kevin Seabrook, Director

of North Central Secure Treatment Unit, Kristopher Reed, Director of South

Mountain Secure Treatment Unit, Randell Swank, Youth Development

Counselor Supervisor, Ranatta Knittle, Youth Development Aide

Supervisor, Veronica Moore, Youth Development Aide, Dorene McDonald,

Youth Development Aide, Timothy Sebastian, Youth Development Counselor Supervisor, and John Does 1-10 and in support thereof alleges as follows:

## Introduction

1.     This action seeks to redress the physical and emotional abuse of youth with mental health and developmental disabilities who live in Pennsylvania's three youth development centers ("YDCs").

2.     Children are placed at the YDCs though the juvenile justice system, starting as young as 12-years-old, for rehabilitation and treatment.

3.     Rather than providing the "state-of-the-art treatment, care and custody services to Pennsylvania's most at-risk youth" as Defendants claim, staff at the YDCs assault, provoke, intimidate, terrify, and humiliate youth with disabilities, stripping them of their right to rehabilitation.  This abuse occurs under the guise of necessary restraints, but in reality – as video footage of the incidents reveal – is physical and emotional abuse against these children.

4.     Restraining youth at the YDCs is not within the staff's discretion or available as a punishment for youth misbehavior.  In fact, restraints are prohibited under state law unless a youth is in danger of harming himself or herself or others, and staff are required to use all less restrictive methods to

calm and de-escalate the situation before resorting to physical restraint. Otherwise, an unnecessary or improper restraint constitutes abuse against the child under state law.

5.      Despite the clarity of state law and DHS policy on these issues, YDC staff routinely engage in illegal and violent physical restraints against children with disabilities, including against youth for minor misconduct, having a bad attitude, not following directions, or fidgeting.

6.      Despite a mandate to de-escalate and accommodate youth with disabilities, YDC staff routinely escalate youth, as video footage reveals, as a pretext for physical restraint.

7.      Staff at the YDCs tackle, punch, and hold youth down in ways that maximize pain and increase potential for injury, including engaging in prone restraints.  YDC staff conduct restraints that involve up to five men on one youth. Restraints at the YDCs involve staff pushing body weight into the youth's joints and using body weight in ways that restrict the youth's breathing.

8.    . Youth with disabilities at the YDCs have been injured by these actions, including cuts, bruises, sprains, black eyes, and for one child, a punch so hard it fractured the orbital bone around his left eye.

9.     Defendants subject youth with disabilities at the YDCs to a hostile environment with verbal harassment, name-calling, taunts, and threats of physical harm by staff, where youth regularly witness verbal and physical abuse of their peers by staff.

10.     In fact, during DRPs' investigation of reports of abusive restraints at that YDCs that led to the filing of this Complaint, YDC staff attempted to interfere with DRP's federal investigatory authority by intimidating and coercing several of the female youth with disabilities to decline to cooperate in the investigation.  YDC staff instilled fear in the youth by, among other things, falsely claiming that DRP's investigation would result in their transfer to adult prison.

11.     This hostile environment is particularly harmful to youth with disabilities, many of whom have diagnoses whose symptoms are exacerbated by it.  Further, youth with disabilities are subjected to abuse and harassment more often than the youth without disabilities at the YDCs, as they are less successful in conforming their behavior and navigating this harsh environment than some of their peers for disability-related reasons.

12.     Defendants are aware that the practice of abusing youth under the guise of restraints at the YDCs violates policy and law, but they have done nothing to stop it.

13.     Defendants' pattern and practice of using improper physical restraints against youth with disabilities and maintaining a hostile environment violates the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fourteenth Amendment right to rehabilitation under the United States Constitution.

14.     This action also seeks redress for Defendants' interference with DRP's federally mandated authority and obligation to investigate potential abuse and neglect of individuals with disabilities under color of state law by Defendants Seabrook and John Does 1-10 is a violation of 42 U.S.C. § 1983, the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801-10807, and the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. §§ 15041-15045.

15.     DRP seeks declaratory and injunctive relief on behalf of all youth with disabilities at the YDCs now or in the future.

## Jurisdiction and Venue

16.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, this being a case arising under the laws of the United States.

17.     Plaintiff's claims are authorized by 42 U.S.C. § 1983, 29 U.S.C. § 794a and 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 12133.

6

18.     Venue is appropriate in this district pursuant to 28 U.S.C. §

1391(b)(1) since the Defendants reside in this district.

## Parties

19.     Plaintiff DRP is a non-profit Pennsylvania corporation.  DRP

and its constituents, individuals with mental health and developmental

disabilities, have been injured as a result of the Defendants' violations of

federal law that are the subject of this Complaint.

a.      The Commonwealth of Pennsylvania has designated

DRP as the protection and advocacy system pursuant to the federal

Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42

U.S.C. §§ 15041-15045, and Protection and Advocacy for Individuals with

Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801-10807.

b.      Under the DD Act, DRP has the authority and duty to

protect the rights of and advocate for individuals with intellectual and other

developmental disabilities through, *inter alia*, the use of legal remedies.  42

U.S.C. § 15043(a)(2)(A); 42 U.S.C. § 10805(a)(1)(B). This authority

includes the right to bring suit against the state or its agencies, and the

state cannot restrict DRP's authority to pursue legal remedies.  42 U.S.C. §

15044(b)(1); 45 C.F.R. § 1386.21(c).  The PAIMI Act confers similar

authority on DRP to pursue legal remedies to ensure the protection of

7

individuals with mental illness who are receiving care or treatment in the state. 42 U.S.C. § 10805(a)(1).

c.   Under the DD Act and the PAIMI Act, DRP has the authority and duty to investigate allegations of abuse of individuals with developmental and mental health disabilities, including the physical abuse of youth at YDCs. 42 U.S.C. § 15043(a)(2)(B); 45 C.F.R. § 1386.19; 42 U.S.C. §§ 10801(b)(2)(B), 10805(a)(1)(A).

d.   As the DD Act requires, DRP's governing board is composed of individuals who broadly represent and are knowledgeable about the needs of individuals with disabilities, and a majority of board members are individuals with disabilities, including those with developmental or mental health disabilities, as well as parents, family members, guardians, or advocates for individuals with disabilities. 42 U.S.C. § 15044(a). As the PAIMI Act requires, individuals who have received or are receiving mental health services, or their family members, are substantially involved in DRP's governance. 42 U.S.C. § 10805(c)(1)(B). In addition to serving on DRP's board, individuals who have received or are receiving mental health services, or their family members, chair and constitute at least 60 percent of its advisory council. 42 U.S.C. § 10805(a)(6)(B-C).

e.    As required, DRP annually establishes goals and priorities based on public input.  45 C.F.R. §§ 1386.22(c)-(d); 42 U.S.C.  § 10805(a)(8) 42 C.F.R. § 51.24.

f.    As required by the DD Act and the PAIMI Act, DRP has a grievance procedure available to assure individuals with disabilities have full access to DRP's services.  42 U.S.C. § 15043(a)(2)(E); 42 U.S.C. § 10805(a)(9); 42 C.F.R. § 51.25.

g.    DRP provides information and referral services, individual representation, education, and other services to individuals with mental health and developmental disabilities on an array of issues, including, *inter alia*, abuse and neglect; access to community-based services; access to health care; unnecessary institutionalization; and discrimination in housing, employment, government services, and public accommodations.

h.    As described below, DRP has spent time, money, and resources assisting youth who were abused under the guise of Defendants' unlawful practices.  These expenditures of time, money, and resources diverted DRP staff from other activities for their constituents.

i.    DRP's constituents include youth who have been or will be harmed by Defendants' abusive and illegal policies, practices, and procedures.

j.   DRP's constituents include youth with disabilities at Defendant's YDCs who are at serious risk of coercion, intimidation, and abuse if they come forward individually.

20.   Defendant DHS is the agency responsible for oversight of the Office of Children, Youth, and Families ("OCYF") and the Bureau of Juvenile Justice Services ("BJJS") and the three YDCs in Pennsylvania.  62 Pa. C.S.A. §§ 301, 302.

21.   Defendant Teresa Miller is the Secretary of DHS and as such is responsible for overseeing the OCYF, the BJJS, and the YDCs.  She is named in her official capacity.

22.   Defendant Charles Neff is the director of BJJS.  He is named in his official capacity.

23.   Defendants John Boyer and Jenny Naugle are the directors of Loysville Youth Development Center and are employees of Defendant DHS under the BJJS. They are named in their official capacities.

24.   Defendant Keith A. Stuck is the director of the boys' program at North Central Secure Treatment Unit and is an employee of Defendant DHS under the BJJS.  He is named in his official capacity.

25.     Defendant Kevin R. Seabrook is the director of the girls' program at North Central Secure Treatment Unit and is an employee of Defendant DHS under the BJJS.  He is named in his official capacity.

26.     Defendant Kristopher Reed is the director of South Mountain Secure Treatment Unit and is an employee of Defendant DHS under the BJJS.  He is named in his official capacity.

27.     Defendant Randell Swank is an employee of Defendant DHS under the BJJS.  At all relevant times, he held the position of Youth Development Counselor Supervisor at North Central Secure Treatment Unit.  He is named in his official capacity.

28.     Defendant Ranatta Knittle is an employee of Defendant DHS under the BJJS.  At all relevant times, she held the position of Youth Development Aide Supervisor at North Central Secure Treatment Unit.  She is named in her official capacity.

29.     Defendant Veronica Moore is an employee of Defendant DHS under the BJJS.  At all relevant times, she held the position of Youth Development Aide at North Central Secure Treatment Unit.  She is named in her official capacity.

30.     Defendant Dorene McDonald is an employee of Defendant DHS under the BJJS.  At all relevant times, she held the position of Youth

Development Aide at North Central Secure Treatment Unit.  She is named in her official capacity.

31.    Defendant Timothy Sebastian is an employee of Defendant DHS under the BJJS.  At all relevant times, he held the position of Youth Development Counselor Supervisor at North Central Secure Treatment Unit.  He is named in his official capacity.

32.    Defendants John Doe 1-10 are employees of Defendant DHS under the BJJS who directed, supervised, or participated in influencing, coercing, intimidating, threatening, or retaliating against female residents of North Central Secure Treatment Unit who authorized release of their records to DRP.  They are named in their official capacities.

### Pennsylvania's Youth Development Centers

33.    In 1959, Defendant DHS established residential YDCs.

34.    Defendant DHS, through its BJJS, operates three YDCs: Loysville Youth Development Center ("Loysville"), North Central Secure Treatment Unit ("North Central"), and South Mountain Secure Treatment Unit ("South Mountain").  DHS is responsible for the management, operations, program planning and oversight of the YDC facilities.

35.    Upon information and belief, children live at the YDCs on average between six and nine months.  Some children are sent to multiple YDCs or back to the same YDC more than once.

36.    Unlike county-based detention centers, YDCs provide longer-term services and other specific programming needs, such as mental health services and drug and alcohol rehabilitation, for juvenile offenders.

37.    The purpose of juvenile adjudication proceedings is not to punish, but to determine appropriate treatment, reformation and rehabilitation.

38.    Indeed, Pennsylvania's Juvenile Act, 42 Pa.C.S. §§ 6301 *et seq.*, obligates Defendants "[t]o provide for the care, protection, safety and wholesome mental and physical development of children."  42 Pa.C.S. § 6301(b)(1.1).

39.    Defendants are also required to provide, "[c]onsistent with the protection of the public interest, . . . for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community."  42 Pa. C.S.A. § 6301(b)(2).

13

40.    Youth are placed at Loysville, North Central, and South Mountain starting when they are as young as 12 years old and may remain until they are 21 years old.

41.    Unlike privately-run juvenile rehabilitation programs, which deny admission to youth whose treatment and other needs cannot be met by the provider, the YDCs cannot deny admission to youth if they have space. Thus, the YDCs are often the providers of last resort for children with the most complex mental health needs and developmental disabilities who are deemed to have "failed to adjust" to privately-run programs.

42.    The majority of children who live at the YDCs have mental health, developmental, or intellectual disabilities – on information and belief, approximately 70 percent – and some of the YDCs have units designated for the care and treatment of children with specific disabilities, such as mental health and developmental disabilities.

43.    In addition, research suggests that 75% of adjudicated youth have experienced traumatic victimization, which makes them more susceptible to post-traumatic stress disorder.

44.    Defendants hold the YDCs out to the juvenile justice system's judges and the public as facilities that comply with the mandates of the Juvenile Act by providing the highest level of treatment and care to youth

with mental health and other disabilities in a therapeutic and individualized environment.  As a result, many youth with disabilities in the juvenile justice system are placed at the YDCs for the express purpose of obtaining such services and treatment.

45.     DHS states that it ensures that every youth at the YDCs receives individualized treatment based on his or her strengths and needs.

46.     Indeed, according to the handbooks provided to residents at North Central, South Mountain and most of the cottages at Loysville, youth at the YDCs have the right to "receive rehabilitation and treatment," the right to "be treated with fairness, dignity and respect," and the right "not to be abused, mistreated, threatened, harassed, or subjected to corporal punishment."  The YDCs also tell youth that their "rights may not be used as a reward or sanction."

### Loysville

47.     Loysville is located in Perry County, Pennsylvania, northwest of Harrisburg.

48.     Loysville's capacity is 108 youth and it typically operates at or close to capacity.

49.     In fiscal year 2017-2018, 265 children were placed at Loysville.

50.   Children at Loysville are housed in six cottages plus a secure unit based on the needs of the youth, which are described by Loysville as follows:

a.   Specialized Treatment and Rehabilitation ("STAR") Cottage houses youth with significant mental health disabilities;

b.   Williams Cottage is now designated for residents who do not meet criteria for specialized treatment, but, in the recent past, Williams Cottage was the designated cottage for "lower functioning" youth or youth with developmental or mental health disabilities;

c.   East Penn Cottage is a general residential cottage;

d.   Juniata Cottage houses older youth who are working on obtaining a GED;

e.   Allegheny Cottage houses young and immature youth, starting at age 12;

f.   ZB Cottage houses youth with shorter and less severe delinquent histories with drug and alcohol issues; and

g.   The secure unit houses children who have been adjudicated based on more serious offenses or who have exhibited aggressive behavior.

51.     The stated mission and vision statements of the STAR cottage are as follows:

> The STAR program provides a safe, secure and therapeutic environment for adjudicated youth with mental health diagnosis.  Through a multidisciplinary team approach, we provide each resident with an individualized treatment plan that enables him to utilize his strengths and correct his weaknesses.  A variety of treatment modalities are employed to meet his physical, educational, emotional, and mental health needs, thus fostering positive changes in his thought process and behavior.  Our ultimate goal is for each resident to become a responsible and productive member of their respective family, school, and community.
>
> We will be the premier correctional/ mental health program in the state of Pennsylvania.  Our staff team will be thoroughly trained in understanding basic mental health issues and the treatment methods associated with each.  We will remain adaptive to the growing changes in the treatment of mental health issues while becoming the model by which new mental health programs are based upon.

### North Central

52.     North Central is located in Danville, Pennsylvania on the grounds of Danville State Hospital.

53.     North Central is a 115-bed facility for both male and female youth, ages 14 through 20.

54.     In fiscal year 2017-2018, 235 youth were placed at North Central.

55.     The boys are housed in the Admissions Building, which has capacity for 60 youth.  Admissions is divided into the following units, which are described by North Central as follows:

      a.     The HOPE Unit houses youth with substance use issues;

      b.     The POWER Unit houses youth who have demonstrated violent behaviors in the community;

      c.     The FOCUS Unit houses youth in need of treatment for mental health disabilities, such as mood disorders, ADHD, post-traumatic stress disorder, bipolar disorder, and borderline personality disorder, as well as youth in need of specialized treatment for mild to moderate intellectual disabilities.  North Central describes the FOCUS Unit as providing a highly-structured, predictable, routine-consistent therapeutic environment; and

      d.     The FOCUS Unit Handbook describes the program as being designed "to enhance the resident's self-esteem and promote a positive identity.  This is accomplished through building upon and reinforcing those skills and abilities that the resident already possesses, providing him with successful experiences and guiding him to make responsible choices. A strength-based approach is used to accomplish this."

56.     The RISE Unit houses youth who score high as to criminogenic risk factors.

57.    The girls at North Central are housed in two buildings, each with two 12-bed units.  The Reed Building houses the Haven Unit and the Honor Unit.  The Green Building houses the Pride Unit and the Guide Unit. According to North Central, the units are not designated to treat specialized populations, but generally provide services targeting delinquency, trauma, loss, and mental health disorders, using a "sanctuary model," which North Central asserts "represents a trauma-informed approach that provides an environment in which healing from psychological and socially traumatic experiences can be addressed."

### South Mountain

58.    South Mountain is located on the grounds of South Mountain Restoration Center in Franklin County, Pennsylvania.

59.    South Mountain is a 48-bed facility for male youth, ages 15 through 21.

60.    In fiscal year 2017-2018, 67 youth were placed at South Mountain.

61.    DHS describes South Mountain as a place for more aggressive and behaviorally challenging juveniles who have not adjusted to other facilities or have had extensive placement histories.

62.    The resident handbook states that South Mountain's mission "is to provide a safe, understanding environment, which supports healthy relationships and boundaries, and encourages personal growth and development by empowering young men to lead responsible lives that instill dignity, integrity, empathy, and respect for all persons, cultures, and communities."

63.    There are three units at South Mountain, which it describes as follows:

a.    The Secure Treatment Program ("Alpha Unit");

b.    The Sexual Behavior Treatment Program ("Charlie Unit"); and

c.    The Special Needs Program ("Delta Unit"), which South Mountain describes as providing programming for children with mental health disabilities and intellectual or cognitive disabilities.

### Use of Restraints is Restricted by Law and Unlawful Restraints Constitute Abuse

64.    Under Pennsylvania law, properly trained staff at the YDCs may physically restrain youth "only when necessary to protect the patient/resident from injuring himself or others, or to promote normal body positioning and physical functioning."  55 Pa. Code § 13.3(a).

65.    YDCs are prohibited from using restraints "as punishment, or for the convenience of staff, as a substitute for program, or in any way that interferes with the treatment program." 55 Pa. Code § 13.3(b).

66.    YDCs are prohibited from using restraints "unless other available techniques or resources have failed, and the least possible restrictions shall be used." 55 Pa. Code § 13.3(b).

67.    YDC staff are required to "reduce the need for restraints by utilizing therapeutic approaches such as goal planning aimed at redirecting and releasing aggression through healthy channels, counseling, and withdrawing a patient/resident from an overstimulating environment." 55 Pa. Code § 13.3(c).

68.    BJJS policy requires that staff use a "system of graduated responses to support individuals requiring behavioral redirection [and] [r]estrictive interventions will be used only when nonrestrictive behavioral support options have been attempted and documented as ineffective." Examples of nonrestrictive behavioral support that staff must use with youth at the YDCs prior to engaging in physical restraints include:

- Positive reinforcement and encouragement, in which staff indicate concern, offer assistance, offer choices, and/or acknowledge or praise the youth;

21

- Minimize external stimuli, in which staff direct an individual to an area where there are minimal stimuli in the environment;

- Decompression strategies, which are sensory supports that are known to reduce the youth's level of anxiety; and

- Planned ignoring which is a measured, purposeful, and communicated decision to disregard annoying or inconsequential behavior.

69.    Under state law, restraints may be used only "when a patient/resident is acting in a manner as to be a clear and present danger to himself, to other patients/residents, or to employees, and only when less restrictive measures and techniques have proven to be or are less effective."  55 Pa. Code § 13.5(b)(1).

70.    Defendants recognize that physical restraints bring the risk of emotional harm, serious injury, or death to the child or staff involved and disrupt the relationships between the youth, family members, peers, and staff.  Dep't of Public Welfare[1], Prone Restraints in Children's Facilities, Bulletin 3800-09-02 (Dec. 19, 2009).

---

[1]    Department of Public Welfare is now Defendant DHS.  Pa Pub. L. 132, §§ 2-3 (Sept. 24, 2014).

71.     The use of prone restraints, in which a youth is held face down on the floor, is prohibited at the YDCs.  A prone restraint puts pressure on the youth's chest and inhibits breathing, which may result in asphyxia or death.  Dep't of Public Welfare, <u>Prone Restraints in Children's Facilities</u>, Bulletin 3800-09-02 (Dec. 19, 2009).

72.     Pennsylvania law prohibits the abuse of residents of the YDCs. 55 Pa. Code §§ 14.5(a); 14.2(b).

73.     Abuse is defined as "an act or omission which may cause or causes actual physical or emotional harm or injury to a patient/resident, or an act which willfully deprives a patient/resident of his rights as defined by the Department."  Actions such as "striking or kicking a patient/resident, restraining a patient/resident improperly or without authorization, and other actions which can be seen as causing physical pain to a patient/resident are strictly forbidden."  55 Pa. Code §§ 14.5(a), (b).

74.     Abuse is further defined as emotional abuse, such as "teasing, humiliating, degrading or intentionally ignoring a patient/resident."  55 Pa. Code § 14.5(b).

75.     The YDCs are required to report abuse against residents under the Pennsylvania Child Protective Services Law, 11 P.S. § 2201-2224, and DHS has procedures for this mandated reporting.  55 Pa. Code § 14.8(5).

76.    If abuse at the YDCs occurs, YDC staff are required to make a report by calling Pennsylvania's "ChildLine" hotline, which is available to accept abuse reports at any time.

77.    Pennsylvania's Child Protective Services Law, 23 Pa. C. S. §§ 6301-6385, defines "child abuse" as "intentionally, knowingly, or recklessly causing bodily injury to a child . . ." or "unreasonably restraining or confining a child . . ." even if it did not result in injury.  23 Pa. C. S. §§ 6301(b.1)(1), (8)(ii).

78.    Defendant DHS is responsible for the operation of ChildLine and for investigating and addressing reports of child abuse.

79.    BJJS policy requires that incident reports be recorded in its electronic information management system, Automated Intake and Incident Reporting System ("AIIRS"), for each instance of restraint.[2]

80.    YDCs have video cameras in a number of the common areas and some of the outside areas on campus.  There are no cameras in the resident's bedrooms, bathrooms and in at least some staff offices. There are "blind spots" in many common areas where the cameras are unable to record activity.

---

[2]    While all three YDCs appear to maintain documentation of restraints in some form, it is not clear whether all use the AIIRS system as required by BJJS policy.

81.    BJJS does not have a written policy regarding retention of video that includes a restraint, but the practice, at least at Loysville, is to allow the recording system to overwrite footage usually within a one-to-three-month time period.

82.    Under BJJS policy, the YDCs are required to have a Restrictive Procedure Reduction Review Committee ("RPRRC") to monitor, review documentation related to restraints of youth by staff, and provide direction in the reduction of restraints.  The RPRRC is required to meet regularly, and no less than quarterly, to maintain minutes of the meetings, and to make recommendations to the agency director or designee.

### Defendants Allow the Widespread Use of Illegal and Abusive Restraints

83.    Despite claims by the Defendants that the YDCs provide the highest level of treatment and care to youth with mental health and other disabilities, youth with disabilities experience something very different at the YDCs.  Youth with disabilities are subjected to physical and emotional abuse, harassment, torment, intimidation, and discrimination.

84.    In or about September 2017, DRP received information about a then-18-year-old youth with mental illness, who was a resident of STAR Cottage at Loysville ("Youth No. 1").  Youth No. 1 had been arrested at Loysville for allegedly assaulting staff and imprisoned in Perry County's jail.

85.   Through the advocacy of his criminal defense attorney, the videos of the incident were reviewed, revealing that Youth No. 1 was assaulted and provoked by YDC staff during three consecutive illegal restraints.

86.   Based on this information, through its authority as the protection and advocacy agency in Pennsylvania, DRP visited Loysville in November 2017 to begin an investigation.  DRP interviewed youth with disabilities and obtained and reviewed records and other documents from Loysville, including videos of physical restraints of youth by YDC staff.

87.   In December 2018, DRP staff again visited Loysville, as well as North Central and South Mountain.  DRP interviewed youth with disabilities in each facility.  DRP also obtained and reviewed records and other documents relating to these facilities.

88.   DRP's investigation, including review of dozens of videos, revealed that YDC staff physically restrain youth with disabilities when there is no risk of harm to the youth, staff, or others.  YDC staff also provoke youth with disabilities into self-harming behaviors or other escalated behaviors as a pretext to justify abuse in the form of physical restraint.

26

89.     YDC staff unlawfully physically restrain youth as a form of punishment for non-aggressive, minor misconduct, often behaviors that are manifestations of their disabilities, such as fidgeting, speaking reflexively, seeking time or space to process emotions, not walking fast enough, shrugging, not being able to write clearly, not being able to clearly communicate, not being able to finish tasks quickly enough, not being able to display expected social behavior, and not being able to stop talking on command.

90.     In addition, YDC staff do not engage in the required less restrictive techniques before engaging in abusive restraints, such as planned ignoring, positive reinforcement, minimizing external stimuli, or decompression strategies.  To the contrary, YDC staff engage in actions that escalate disability-related behaviors, such as yelling in youth's faces, crowding and/or aggressively approaching youth, demanding that the youth "process" with staff, name-calling, and inappropriate and intimidating gesturing.

91.     If one YDC staff is yelling at a youth, other YDC staff at times congregate around the youth in preparation for an unlawful and abusive restraint as if it has been pre-determined that a restraint will take place.

Videos reveal that YDC staff chat amongst themselves and sometimes laugh while a youth is being physically abused under the guise of restraint.

92.    Even when not showing signs of escalation, youth with disabilities are subject to unlawful abusive restraints.  Youth with disabilities reported being in their beds at night when YDC staff entered their rooms and pulled them out of bed into a restraint.  As noted above, there are no video cameras in the youths' bedrooms.

93.    In addition to engaging in restraints without proper justification, YDC staff use inappropriate restraint techniques that increase the likelihood of pain and injury to youth.  In one incident captured on video, YDC staff pushed an impact cushion into the face of a youth with asthma for at least 10 minutes.

94.    YDC staff use prone restraints on children with disabilities.

95.    YDC residents refer to the abusive, unnecessary, inappropriate, and punitive restraints as "dirty restraints."  YDC residents indicate "dirty restraints" are used frequently and take a variety of forms.  For example:

- During a restraint in which the youth is held on the floor, YDC staff apply unnecessary pressure to the youth's joints or apply the weight of their bodies across the youth's chest, which inhibits breathing.

28

- During restraints in which the youth is seated on the floor with the youth's legs in front of him, YDC staff push on the youth's back while the youth's arms are held behind him until his head approaches or touches the floor.

- YDC staff punch, kick, hit, and choke youth during restraints.

96. Youth with disabilities are injured by this assaultive behavior and illegal restraint techniques, ranging from sore shoulders and joints to split lips, cuts, bruises, black eyes, and head injuries.

97. Defendants are required under state law and their own policies to properly train YDC staff on appropriate restraint methods and the prohibition against abuse, including how to avoid provoking youth with disabilities, how to recognize behavior associated with disabilities and how to utilize de-escalation techniques rather than engaging in conduct that escalates youth with disabilities.

98. YDC staff "restrain" youth for unnecessarily long periods of time.

99. YDC staff frequently engage in violent, illegal restraints in places where there is no video surveillance, even if it means conducting the restraint far-removed in time and location from the behavior that allegedly prompted it.

100.  In addition, videos of restraints are not maintained to ensure meaningful opportunity to review, monitor and provide oversight to ensure the proper use of restraint.

101.  Staff are required to prepare a written report of a restraint. Written reports of events leading up to and including the restraints frequently do not match video documentation of events, where such video documentation exists.  Even where no video documentation exists or is maintained, written reports of restraints confirm that youth are being illegally restrained.

102.   Despite the inconsistencies in the written and video documentation, the evidence of illegal restraints in the written reports, and the requirement that the RPRRC monitor, review documentation, and provide direction in the reduction of restraints, insufficient action is taken by Defendants to prevent illegal restraints.

103.  Although DHS policy mandates the existence of the RPRRC and requires that it monitor, review documentation, and provide direction in the reduction of restraints and that it meet no less than quarterly, to maintain minutes of the meetings, and to make recommendations to the agency director or designee, there were no minutes of meetings in 2017, and upon information and belief, no minutes in 2018.

104.  Defendant DHS similarly fails to ensure that reports of abuse of youth with disabilities that result from illegal restraints and that are received through its ChildLine hotline are adequately investigated and that incidents of abuse are adequately addressed.  Often, the youth who was reported to be the subject of abuse is either not interviewed as part of the investigation or interviewed in cursory fashion with YDC staff aware of the interview and its results and/or present.

### Defendants have Created a Hostile Environment for Youth with Disabilities

105.  For youth with disabilities, the environment at the YDCs is abusive and hostile.

106.  Youth with disabilities in the YDCs live in fear of being abused for conduct that is attributable to their disabilities.

107.  Youth with disabilities report that YDC staff frequently harass, taunt, and threaten them, often yelling in their faces, because of their known and often documented disabilities or disability-related behavior.

108.  Staff use derogatory language and name-calling toward youth with mental health and developmental disabilities.  For example, during a restraint of a youth with known mental health disabilities, staff pushed his elbow into the youth's shoulder and told him, "I'll show you crazy."  During a restraint of a youth with known disabilities for allegedly writing graffiti on a

desk, YDC staff yelled at the youth that he was "going to fucking learn."
Additionally, YDC staff refer to youth with disabilities as "dogs," "fucking
dumm[ies]" and state that they "hate stupid people," referring to youth with
disabilities.  A youth with Tourette's was told by YDC staff to "shut the
monkey noises up."  A youth with a speech impediment was laughed at
when she could not properly pronounce certain words.

109.  Youth with disabilities at the YDCs report that staff destroy
personal property in the youth's room during restraints.

110.  Youth with disabilities at the YDCs report that staff brag and
laugh about their abusive treatment of residents, including after an incident
that resulted in the youth having a black eye and scratched neck.

111.  Youth with disabilities report that YDC staff intentionally spit
tobacco in their faces during restraints.

112.  This verbal and physical harassment serves to escalate the
youth with disabilities, who may already have difficulty conforming to the
strict and detailed behavioral standards due to their disabilities, which at
times and at staff discretion include putting hands on laps (until told to
relax), head and eyes facing forward at all times, no slouching, putting feet
flat on the floor, making eye contact and no singing or humming.

113.  Youth with disabilities, with little or no warning, are often moved to individual care rooms or ICRs – small secluded padded rooms where staff monitor youth and do not allow them to leave. In these exclusion rooms, youth can spend hours or days separated from their program and education.

114.  In many cases, the YDC staff meant to provide individual counseling to youth on a range of issues are the same staff that have performed illegal and abusive restraints on the youth.

115.  YDC staff have extensive authority and power over youth within the YDCs, including, among other things, whether youth receive medical and/or mental health treatment, and whether youth are punished or rewarded, and whether youth can speak to and visit with family members.

116.  Youth report that YDC staff assert that they have the power to decide to "keep [youth] here longer" and "have the power over [youth] going home."

**These Abusive and Hostile Conditions at the YDCs Have Negative Effects on the Treatment, Rehabilitation, and Mental Health of Children with Disabilities**

117.  Illegal and abusive restraints at the YDCs are harmful to youth with disabilities.

118. A number of youth reported they did not feel safe and felt afraid at the YDCs. A number of youth expressed fear of retaliation by YDC staff if they reported the abuse.

119. Youth with disabilities reported seeing and hearing the abuse of their peers. They see or hear their peers crying that they cannot breathe during restraints. They see the injuries of their peers after an illegal, abusive restraint. This causes distress and decompensation of youth with disabilities.

120. Youth with disabilities who have experienced prior trauma are negatively affected by the anticipation and/or experience of more trauma.

121. Unlawful, unnecessary, and abusive restraints serve to re-traumatize youth who have already been subject to significant trauma in their childhoods, as many of the children with disabilities have post-traumatic stress disorder.

122. The YDCs have a policy or practice of imposing punishment on youth, such as a loss of privileges or exclusion from programming, because they were subject to a restraint because they engage in behavior attributable to their disabilities.

123. Illegal and abusive restraints result in youth remaining at the YDCs longer than necessary because they are reported to the probation

officers and the courts as misbehavior of the youth and evidence of the youth not being ready for discharge from the YDC, without indication of the provocation, harassment and/or assaultive behavior by YDC staff that led to the incident – even in instances in which staff is found to have behaved improperly or illegally during a restraint.

124.   Youth with disabilities live at the YDCs longer than is necessary due to the abusive, hostile, and discriminatory treatment they receive as a result of their disabilities at the facilities.

125.   This hostile and abusive environment exacerbates the symptoms of the children's disabilities and is not conducive to treatment or rehabilitation.   This is particularly true given that the YDC staff who conduct the illegal and abusive restraints are often their counselors or otherwise part of the team responsible for providing treatment and rehabilitation.

### Exemplars[3]

**Youth No. 1**

126.   Youth No. 1 was admitted to Loysville on August 21, 2017.

---

[3]   Identifying details have been removed to maintain the anonymity of these exemplars, who were 13 to 18 years old at the time of these events and came from Allegheny, Bradford, Bucks, Erie, Fayette, Lehigh, Philadelphia, and York Counties.

127.   Youth No. 1 has a number of mental health disabilities, a seizure disorder, PTSD, and has a history of childhood physical and sexual abuse.  Youth No. 1 has a history of auditory hallucinations.  He was assigned to STAR Cottage.

128.   Youth No. 1 was subjected to illegal and abusive restraints and a hostile environment at Loysville.

129.   On September 3, 2017, Youth No. 1 was subjected to three illegal restraints and assaulted by Loysville staff.

130.   Despite the existence of videos reflecting that Youth No. 1 was abused, Loysville staff contacted the Pennsylvania State Police to report that YDC staff wished to press charges against Youth No. 1 for assault.

131.   Based on this report, Youth No. 1 was taken into custody and incarcerated at the Perry County Prison.

132.   The report made to the Pennsylvania State Police by YDC staff was false and/or misleading.

133.   Indeed, on October 30, 2017, after Youth No. 1's criminal defense lawyer was able to obtain and view the videos, Defendant Naugle, one of the directors of Loysville, was forced to contact the Perry County district attorney to "correct the record," which she did by email on October

30, 2017, after Youth No. 1 had been sitting in jail for eight weeks.  See email from J. Naugle (Oct. 30, 2017), attached as Exhibit A.

134.  As Ms. Naugle confirmed, in stark contrast to the video of the incidents, the BJJS Special Report, which was signed by three YDC staff and stated that Youth No. 1 had committed "Multiple Assaults on Staff at LYDC on September 3, 2017," was false and grossly mischaracterized what occurred to the intended detriment of Youth No. 1.

135.  Indeed, the first video shows Youth No. 1 sitting in a chair with his hands on his knees, as directed by YDC staff.

136.  According to the AIIRS report, Youth No. 1 was looking around and laughing.

137.  According to the AIIRS report, YDC staff "attempted a Multiple Person Extended Arm Assist to assist [Youth No. 1] out of the TV room."

138.  As Ms. Naugle's email concludes, "[h]ere is where the inaccurate account of the incident begins."  See email from J. Naugle, Ex. A.

139.  A "Multiple Person Extended Arm Assist" is considered to be the least restrictive physical restraint technique used at the YDCs and requires staff to stand beside or behind the youth placing on hand on the

resident's shoulder blade and one on the bicep area while helping him up to walk on his own.

140.   Contrary to the AIIRS report, the videos demonstrate that YDC staff approached Youth No. 1 from the front, grabbed his shirt in the chest area and pulled Youth No. 1 out of the chair.  As Defendant Naugle concluded, "[t]his is NOT appropriate."  See email from J. Naugle, Ex. A.

141.   According to the AIIRS report, Youth No. 1 began "to pull away and tried to throw punches in a wild manner, striking [YDC staff] on the left side of the head 2-3 times."

142.   Again, this assertion is belied by the video and, according to Defendant Naugle, "this is not an accurate representation of what happened."   To the contrary, when YDC staff pulled Youth No. 1 up from his seat, Youth No. 1's arms did not swing around wildly and there were no punches thrown.

143.   Instead, a YDC staff member continued his grip on Youth No. 1's shirt pushing him back over the chair with his shirt partially covering his face.

144.   The video shows two other YDC staff members then arrived to assist by restraining Youth No. 1 over the chair.

145.   Contrary to YDC policy, which requires using the least restrictive approach and communication among staff members as to what they were trying to accomplish, the three YDC staff members were pushing and pulling or holding Youth No. 1, appearing to Defendant Naugle to be working against each other for approximately one minute.  Once one of the staff members, who is described by Defendant Naugle as "very large," moved away, Youth No. 1 was able to get out of the chair and leave the room assisted by YDC staff.  See email from J. Naugle, Ex. A.

146.   According to the AIIRS report, Youth No. 1 "began to struggle and tried to pull away."  As confirmed by Defendant Naugle, "[t]he video does not reflect that statement."  See email from J. Naugle, Ex. A.

147.  As Defendant Naugle and the second video confirmed, Youth No. 1 was not physically resisting or trying to pull away and "was certainly not in a position to use his fists in this video either."  See email from J. Naugle (Oct. 30, 2017), Ex. A.

148.   The third video reflects that Youth No. 1 was sitting on the floor in the ICR.  According to Defendant Naugle, this "is an ideal situation."  See email from J. Naugle, Ex. A.

149.   As Defendant Naugle explained, YDC staff are required to remain outside the room to allow the resident to calm down.  YDC staff are

not to try to engage the youth to "process what the kid did wrong." See email from J. Naugle, Ex. A.

150. Even where a youth is verbally combative, if he is seated as Youth No. 1 was, "he is not a physical threat." See email from J. Naugle, Ex. A.

151. The YDC staff member with whom the resident had a problem is not to be in the room trying to engage an already agitated the resident. Here, YDC staff did just that. The YDC staff member with whom Youth No. 1 had the issue walked in and out of the ICR engaging Youth No. 1. See email from J. Naugle, Ex. A.

152. According to Defendant Naugle, "[a]t that point, [Youth No. 1] escalates again, stands to go after [YDC staff]." Defendant Naugle noted that, at this point, Youth No. 1 did swing his fist and connect with a YDC staff member.

153. However, as Defendant Naugle observed, "absent the initial provocation by staff, this entire situation may have been avoided and we would not have a mental health youth with emotional problems sitting in Perry County Prison." See email from J. Naugle, Ex. A.

154. After watching the videos, Ms. Naugle concluded: "I do not see an assault [by Youth No. 1]." See email from J. Naugle, Ex. A.

155.   Following the discovery and review of the video by authorities, the criminal charges against Youth No. 1 were dropped and Youth No. 1 was released from Perry County Prison.

156.   Youth No. 1 remained in Perry County Prison until November 3, 2017.

157.   No report to ChildLine was made as a result of the September 3, 2017 illegal restraint until November 1, 2017.

158.   The AIIRS report is false and/or misleading and was written in a way to justify the illegal and abusive actions of YDC staff.

159.   The AIIRS Report classified the incident as "minor misconduct" and the reason for the restraint as "physical aggression toward staff."

160.   This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

161.   Youth No. 1 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at Loysville.

162.   Youth No. 1 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at Loysville.

163. Even following this incident, Defendants did not take corrective action sufficient to address abusive and illegal restraints.

**Youth No. 2**

164. Youth No. 2 was committed to Loysville and assigned to the STAR Cottage on December 19, 2016 and again on October 24, 2017.

165. Youth No. 2 has a variety of mental health disabilities, including bipolar disorder and ADHD, mild intellectual disability, and post-traumatic stress disorder from abuse he suffered.

166. Youth No. 2 was subjected to illegal and abusive restraints and a hostile environment at Loysville.

167. For example, on October 29, 2017, Youth No. 2 had an injured knee that was wrapped in a bandage and was using crutches.

168. Earlier in the day, a Youth Development Aide Supervisor ("YDAS") made fun of Youth No. 2 for using crutches and told Youth No. 2 not to use the crutches. Youth No. 2 reported to another YDC staff member that he was upset by this statement and it made him feel like hitting the YDAS with his crutches. According to the AIIRS report, Youth No. 2 "never once showed any sign of physical or even visible emotional aggression."

42

169.   Later, when Youth No. 2 was reportedly in "a better state of mind," YDC staff asked Youth No. 2 to meet with the YDAS to "process" his emotions.

170.   YDC staff observed that the meeting put Youth No. 2 into "somewhat of an escalated state," according to the AIIRS report, due to Youth No. 2's "inability to process the information that he was given."

171.   At staff direction, Youth No. 2 sat at a table in the hallway to try to process his emotions and calm down.

172.   As reflected in the video of the incident, while Youth No. 2 sat at the table, the YDAS paced back and forth, in and out of the hallway, engaging Youth No. 2, and, ultimately, the YDAS grabbed Youth No. 2's shirt, pulled him out of the chair, and tackled him to the floor.

173.   At first, Youth No. 2 was held down by two staff.  Then additional staff joined in until Youth No. 2 was held down by five adult YDC staff members.

174.   After the YDAS who initiated the incident released his hold on Youth No. 2, he remained in sight, pacing in the room in front of Youth No. 2.  Other YDC staff gathered around Youth No. 2 on the floor to observe, intensifying the situation.

175.  Eventually, YDC staff released Youth No. 2 and Youth No. 2 walked escorted by staff to the ICR where he sat on the floor.

176.  Two YDC staff members entered the ICR with Youth No. 2 and four YDC staff members stood at the door.

177.  The video reflects that Youth No. 2 was in significant pain in the ICR, crying and rubbing his knee.  YDC staff stood in the ICR chatting and laughing with each other.

178.  YDC staff kept Youth No. 2 in exclusion in the ICR for nearly two and a half hours.

179.  The nurse checked Youth No. 2 while he was in the ICR.  His head was bleeding from the assault and he reported pain to his injured knee.

180.  Youth No. 2 did not act aggressively toward staff, but rather reacted defensively by trying to avoid being tackled and then balling up on the floor.

181.  According to the AIIRS report, he sobbed and breathed heavily during the restraint and in the ICR.

182.  The AIIRS report, which includes information from seven YDC staff present in STAR Cottage at the time, describes aggression by Youth No. 2.  This is belied by the video of the incident.

44

183.  The AIIRS report is false and/or misleading and was written in a way to justify the illegal and abusive actions of YDC staff.

184.  The AIIRS report classified the incident as "minor misconduct" and the reason for the restraint as "threat to staff."

185.  The AIIRS report falsely states that Youth No. 2 was not injured from the restraint.

186.  This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

187.  Youth No. 2's records reflect that he was physically restrained by YDC staff at Loysville five times between January and November 2017. There are videos of only two of these restraints.

188.  Youth No. 2 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at Loysville.

189.  Youth No. 2 suffered emotional distress and exacerbation of his mental health disabilities due to the hostile environment in the STAR cottage at Loysville.

190.  Youth No. 2 has suffered injuries as a result of physical restraints.

191.   Youth No. 2 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at Loysville.

**Youth No. 3**

192.   Youth No. 3 was placed at Loysville on October 16, 2017 and then was transferred to North Central on January 17, 2018.  Youth No. 3 is still living at North Central.

193.   Youth No. 3 has a number of mental health disabilities, including ADHD, bipolar disorder, and post-traumatic stress disorder, due to abuse he endured as a child.  Youth No. 3 also has asthma.

194.   Youth No. 3 was assigned to Williams Cottage at Loysville upon admission, but was quickly transferred to STAR cottage due to his mental health needs.

195.   A psychiatric evaluation dated October 23, 2017 suggested that Youth No. 3 might have a diagnosis of intellectual disability and indicated that he should be tested for that disability.  Although he continues to struggle with his education, independent living skills, and mental health programming, upon information and belief, Youth No. 3 has not received testing to determine if he has intellectual disability.

196.   Loysville completed his mental health treatment plan on November 27, 2017, more than a month after this admission.  By that time, Loysville staff had subjected Youth No. 3 to 13 physical restraints in 26 days.

197.   Per Loysville policy, if a child is subjected to four or more restraints in three months, a Restrictive Procedures Plan ("RPP"), which is a specific individualized plan developed cooperatively with residents and employees designed to help a resident maintain self-control during periods of escalation as well as identified behavioral expectations that will assist in maintaining resident self-control and/or de-escalation, and an Adolescent Safety Zone Tool, which is an assessment to define triggers and calming techniques specific to a resident, should be developed for the child to reduce the number of restraints and assist the team with de-escalation techniques.

198.   Youth No. 3's RPP notes that disability-related "triggers" for Youth No. 3 include being confronted, yelling, being touched, being forced to talk, and seeing other children be restrained or out of control.

199.   In violation of Loysville policy, an Adolescent Safety Zone Tool was not developed for Youth No. 3.

200.  Youth No. 3 was and continues to be subjected to illegal and abusive restraints and a hostile environment at the YDCs.

201.  For example, on November 21, 2017, while Youth No. 3 was at Loysville, staff reported that Youth No. 3 "woke up in a horrible space" and "could not follow any staff directives . . ."  He was redirected for talking in the bathroom and, according to the AIIRS report, "he immediately began to provide feedback."

202.  According to the AIIRS report, Youth No. 3 "mumbled under his breath [sic] went to his room and sat on his bed and stated that he would not complete anything further during the day."

203.  This led to a physical restraint and exclusion in the ICR.

204.  According to the AIIRS report, approximately an hour later, while Youth No. 3 was in the ICR, he was provided with a breakfast meal, which he refused to eat.

205.  According to the AIIRS report, "[d]ue to resident [Youth No. 3] showing more signs of increased agitation and verbal threats to assault staff as well as harm himself, the meal was removed by [YDC staff] as a safety and security precaution in the best interest of resident [Youth No. 3] as well as staff present at the time."

206.  According to the AIIRS report, "[r]esident [Youth No. 3] proceeded to scream further at staff present. Unsure of his intentions [two YDC staff members] closed proximity by entering the ICR area, still instructing resident [Youth No. 3] to please calm down.  However, without warning resident punched himself in the face, hard."

207.  According to the AIIRS report, this resulted in another physical restraint, "at approximately 0717, Safe Crisis Management (SCM) had to be utilized to manage the self-harming behavior of STAR resident [Youth No. 3]," Youth No. 3's 11th restraint in 23 days.

208.  The video of the incident contradicts the YDC incident report compilation.  The video contains no audio.

209.  At the beginning of the video at approximately 6:59 a.m., Youth No. 3 was sitting in the small ICR alone on the floor in the corner.  Because of the room's size, his feet were near the doorway.  Other than his shoes, the room was empty.  Youth No. 3's hands, arms and head were inside his t-shirt as Youth No. 3 appeared to be attempting to self-soothe.

210.  As reflected in the video, one YDC staff member ("YDC Staff No. 1") was seated in a chair outside, at times interacting with Youth No. 3 in what appeared to be a calm fashion.[4]

211.  At approximately, 7:08 a.m., another YDC staff member ("YDC Staff No. 2") entered the room, sat on the floor and appeared to speak to Youth No. 3.  Youth No. 3 and YDC Staff No. 2 appear to engage in a calm dialogue.

212.  A third YDC staff member ("YDC Staff No. 3") can be seen directly outside the doorway.

213.  At approximately 7:24 a.m., a fourth YDC staff member arrived and appeared to provide Youth No. 3 with medication.  This is the first time Youth No. 3 removed his arms from inside his shirt.

214.  At approximately 7:36 a.m., YDC Staff No. 2 exited the ICR. Youth No. 3 was balled up in the corner.  His arms were wrapped around his knees and his head was down on his knees.

215.  At approximately 7:38 a.m., YDC Staff No. 2 brought Youth No. 3 food in a container, which Youth No. 3 opened.

---

[4]     In describing abusive restraints, involved YDC staff are identified by number for clarity purposes.  The numbering in each restraint is separate and the use of the numbering system is not intended to indicate whether the same YDC staff member was involved in more than one illegal restraint.

216.   Within seconds, however, Youth No. 3 was confronted by a fifth YDC staff member ("YDC Staff No. 5"), who appeared to be agitated, was standing or leaning over and/or toward him and was speaking to Youth No. 3 in close proximity to him.   She approached Youth No. 3 multiple times in what appeared to be an agitated state, gesturing and appearing to taunt Youth No. 3.   She turned to leave and returned approximately 10 or more times, each time re-engaging Youth No. 3.   During what appeared to be a heated exchange, YDC Staff No. 5 kicked Youth No. 3's shoes out of the ICR, in apparent preparation for a restraint.

217.   During this exchange, Youth No. 3 appeared to be upset and hung his head while YDC staff continued to escalate the situation, appearing to yell, mock, and/or taunt Youth No. 3.

218.   At approximately 7:42 a.m., Youth No. 3 was still seated in the same position in the corner of the small ICR with his knees bent, feet on the floor and head down with his arms wrapped around his head.

219.   YDC Staff No. 1 entered the ICR and removed Youth No. 3's breakfast.   YDC Staff No. 5 remained near the doorway and appeared to continue to engage Youth No. 3.   At the same time, YDC Staff No. 3 appeared back in the doorway.

220.  At approximately 7:43 a.m., after being repeatedly taunted and provoked and unable to continue to cope, Youth No. 3 began punching himself in the face.  YDC Staff No. 1 and No. 3 restrained Youth No. 3, who was still seated in the same position on the floor.

221.  YDC Staff No. 5 appeared to continue to engage Youth No. 3 and also entered the small ICR.

222.  Youth No. 3 was by this time underneath YDC Staff No. 1 and No. 3 and cannot be seen well on the video.

223.  YDC staff No. 2 entered the small ICR with an impact cushion. By this point, there were four YDC staff in the small ICR.

224.  YDC Staff No. 5 appeared to continue to be gesturing and engaging Youth No. 3.

225.  At approximately 7:47 a.m., three YDC staff members attempted to force Youth No. 3 down on his back, but he initially appeared to be guarded in his balled-up position.

226.  While an impact cushion was brought in by YDC staff, at approximately 7:48 a.m., it appeared to have been placed over Youth No. 3's face at a time that each of his arms and his legs were being held by three YDC staff.  The AIIRS report does not describe use of this cushion to cover Youth No. 3's face or explain why that would be appropriate.

227.  YDC Staff No. 5 left and returned with what appeared to be paper towels.  The impact cushion was lifted and Youth No. 3's bloody face was wiped.

228.  Four additional YDC staff members arrived and three of them switched places with three of the staff initially involved in the restraint.

229.  At approximately 7:58 a.m., Youth No. 3 was put in a seated position.  Five YDC staff remained in the small ICR with Youth No. 3.

230.  Youth No. 3 remained seated with his head down.

231.  At approximately 7:59 a.m., a YDC staff member in the ICR with Youth No. 3 waved to the camera as if the entire incident was a joke.

232.  The AIIRS report is false and/or misleading and was written in a way to justify the illegal and abusive actions of YDC staff.

233.  The AIIRS report classified the incident as "minor misconduct" and the reason for the restraint as "self-injurious behavior."

234.  At North Central, Youth No. 3 continues to be subjected to abuse in the form of illegal restraints.  He is described as "the scapegoat on the dorm."

235.  For example, Youth No. 3 has reported being restrained while sitting with his feet in front of him, staff pulling his arms behind his back and pushing him forward until his head nearly touches the ground.  He has

screamed that he cannot breathe in that position due to his asthma and from the pain.

236.   Youth No. 3 reports pain in his shoulders from having staff pull his arms behind his back during restraints.  On January 27, 2018, February 9, 2018, May 24, 2018, June 26, 2018, and August 25, 2018, Youth No. 3 reported shoulder pain to YDC nursing staff immediately following physical restraints involving multiple YDC staff members.

237.  YDC staff have entered Youth No. 3's room in the evening to escalate behavior by yelling and swearing in his face.  Youth No. 3 has been restrained at North Central for "moving" contrary to staff directive when he started shaking while being yelled at in his face by staff.

238.   These restraints, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

239.   Youth No. 3's records reflect that he has been physically restrained by YDC staff at Loysville 20 times between October and December 2017.  There are videos of only nine of these restraints.

240.   Youth No. 3's records reflect that he has been physically restrained by YDC staff at North Central seven times between January 2018 and January 2019.  There are no videos of any of these restraints.

241.  Youth No. 3 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at the YDCs.

242.  At North Central, Youth No. 3 has cycled through his treatment groups and has not implemented the treatment concepts in a consistent manner.

243.  Despite Youth No. 3's lack of progress at North Central, his projected release date is not until October 2019.  To date, he has no identified release resource.  A September 21, 2018, court order prohibits contact between Youth No. 3 and his parents and efforts to identify other kin have been unsuccessful.  Unless familial or other community supports are identified, Youth No. 3 could remain at North Central beyond the October 2019 projected release date.

244.  Youth No. 3 has witnessed illegal and abusive restraints of and injuries to his peers.

245.  Youth No. 3 suffered emotional distress and exacerbation of his mental health disabilities due to the hostile environment at Loysville and North Central.

246.  Youth No. 3 has suffered injuries as a result of physical restraints including bilateral shoulder pain, nosebleeds, swelling around his

right eye with minor bruising, an abrasion on his scalp, an abrasion on his arm, a cut to his nose, a bump on his head from banging it on the back of a chair.

247.   Youth No. 3 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at Loysville and North Central.

248.   Youth No. 3 continues to reside in Defendant's hostile environment and is likely to experience illegal and abusive restraints in the future.

**Youth No. 4**

249.   Youth No. 4 was committed to North Central on December 20, 2017.

250.   Youth No. 4 has a number of disabilities, including schizoaffective disorder, posttraumatic stress disorder and intellectual disability.  Prior to commitment to North Central, he had a history of multiple inpatient psychiatric admissions, at least some of which were known to North Central staff.  Youth No. 4 also has a history of auditory hallucinations.

251.   Youth No. 4 was assigned to the FOCUS Unit.

252.  Youth No. 4 has been subjected to illegal and abusive restraints and a hostile environment at North Central.

253.  For example, on January 4, 2018, YDC staff observed Youth No. 4's shower shoe, known as a "slide," enter the hallway outside of his room.  Two staff members investigated.  According to the AIIRS report, Youth No. 4 was sitting in the corner of his room.  Youth No. 4 reported that "he heard voices talking to him."

254.  YDC staff "confronted" Youth No. 4, seeking to know "what was wrong," but Youth No. 4 did not answer.  Instead, according to the YDC compilation report, Youth No. 4 "suddenly stood up and walked out into the hallway and sat on the floor."  YDC staff reported that they escorted Youth No. 4 back to his room.

255.  At no point during this incident did YDC staff consult with the YDC psychiatrist or other qualified mental health professional about Youth No. 4.

256.  Instead of obtaining appropriate mental health services, YDC staff escalated the situation, engaging with Youth No. 4 about "task work" he was apparently assigned the evening before as a result of "an accountability," which, according to his January 23, 208 treatment plan, was as a result of an unspecified violation of a norm of the program.

According to the YDC compilation report, Youth No. 4 expressed that he did not want to complete his task work and that YDC staff should "just put him in the desk forever."

257.   YDC staff then attempted to convince Youth No. 4 that "his task work isn't that hard and that he didn't want to be in a desk forever."

258.   Youth No. 4 reportedly expressed that "he didn't care about being here and didn't care about going home."

259.   According to the YDC compilation report, Youth No. 4 "turned around and threw his fist up at [YDC staff] like he was going to hit him." Youth No. 4 was instructed to have a seat on his bed.  Youth No. 4 complied.

260.   Youth No. 4 then reportedly "laid down on his stomach and said 'I'm not doing anything, I'm just going to sleep.'"

261.   YDC staff again escalated the situation, telling Youth No. 4 that "he had to sit up and process with staff."

262.   In response, Youth No. 4 reportedly got up and sat in the corner of his room.

263.   YDC staff reportedly "tried talking to him about what was going on and trying to get him to complete his task work."

264.   Without saying a word, Youth No. 4 reportedly got up and walked toward the door of his room.

265.   YDC staff "stopped him from leaving the room and told him to have a seat at his desk."

266.   According to the YDC compilation report, Youth No. 4 "just kept walking around the room saying he was [sic] going to do anything and told staff to just leave his room."

267.   YDC staff continued to insist that Youth No. 4 sit at his desk.

268.   Youth No. 4 complied and put his head down.

269.   YDC staff remained in Youth No. 4's room.

270.   Reportedly, after approximately five minutes, Youth No. 4 "stood up and tried to push [YDC staff]."

271.   Having provoked and agitated Youth No. 4, who had reported that he was in the midst of a mental health episode, clearly requested to be left alone, and repeatedly attempted to control his emotions, YDC staff then physically restrained Youth No. 4.  The restraint involved four YDC staff members and lasted more than an hour.

272.   There is no video of this incident.

273.  By way of a second example, on May 4, 2018, YDC staff reported calling Youth No. 4 to the door to ask him if he had completed an "accountability" that was given to him the night before.

274.  Youth No. 4 responded that he had not.

275.  YDC staff advised Youth No. 4 that "he was going to lose his free time and have no further privileges until he completed the accountability."

276.  According to the YDC compilation report, Youth No. 4 became upset and "began to yell out of his room 'this is bullshit,' smacked his wall and entered his room and began to throw items around his room."

277.  Two YDC staff members went to Youth No. 4's room "to confront his behavior."

278.  Youth No. 4 was sitting in the corner of his room and was reportedly observed to be "very upset and clenching his fists."

279.  Youth No. 4 was directed to sit at his desk, "which he did without any problem."

280.  According to the YDC incident compilation report, "[o]nce resident [Youth No. 4] was sitting at his desk, he was being questioned as to why he did not get his accountability completed and he said nothing, [YDC staff] asked resident [Youth No. 4] again and he again said nothing[.]"

281.   According to the YDC incident compilation report, Youth No. 4 "was visibly upset[.]"

282.   There is no record that YDC staff engaged in de-escalation techniques as required by state law and DHS policy, but rather, the record shows continued confrontation and escalation of Youth No. 4.

283.   According to the YDC compilation report, Youth No. 4 "attempted to raise his hand to smack [YDC staff] but was not successful due to [another YDC staff member] grabbing his hand and placing it on the desk and telling resident [Youth No. 4] to keep his hands on the desk and not to move them."

284.   Despite the fact that Youth No. 4 was visibly upset and was not able to express himself at that time, YDC staff continued to provoke and antagonize Youth No. 4.

285.   According to the AIIRS report, Youth No. 4 "was being questioned again and struck [YDC staff] in the face . . ."

286.   YDC staff then physically restrained Youth No. 4.  According to the AIIRS report, during the restraint, Youth No. 4 "hit his face off the end of his bed causing his lip to split and beg[i]n bleeding."

287.   According to the YDC compilation report, the restraint lasted approximately 30 minutes.

288.  According to the YDC compilation report, "a small avulsion was noted to the left lower lip" and "[a] small reddened area was noted to the left lateral eye."

289.  The YDC compilation report classified reason for the restraint as "assault on employee."

290.  There is no video of this incident.

291.  YDC staff reported both of these incidents to the judge who determines when Youth No. 4 can be discharged from North Central and Youth No. 4's probation officer.  The description of the incidents provided by YDC staff created the impression that Youth No. 4 assaulted and/or attempted to assault staff unprovoked, which resulted in the restraints.  The report did not reflect the facts that Youth No. 4 complied with a number of staff requests, requested to be left alone and tried repeatedly to control his emotions while being continuously confronted by YDC staff.  YDC staff also failed to report that Youth No. 4 described that he was hearing voices and that he was offered no mental health treatment at that time.

292.  This false and/or misleading report was sent to the judge for use in deciding whether and for how long Youth No. 4 must remain at North Central.

293.   These restraints, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

294.   Youth No. 4's records reflect that he had been physically restrained by YDC staff four times between January and October 2018.  No videos of these restraints exist.

295.   Youth No. 4 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at North Central.

296.   Youth No. 4 has suffered injuries as a result of physical restraints including a wrist injury in the form of a possible radial nerve dysfunction/strain.

297.   Youth No. 4 suffered emotional distress and exacerbation of his mental health disabilities due to the hostile environment at Loysville and North Central.

298.   Youth No. 4 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at Loysville.

299.   Upon information and belief, Youth No. 4 continues to reside in Defendant's hostile environment and is likely to experience illegal and abusive restraints in the future.

**Youth No. 5**

300.  Youth No. 5 was committed to North Central on November 14, 2018.

301.  Youth No. 5 has a number of disabilities, including mood disorder and ADHD.

302.  Youth No. 5 was assigned to the FOCUS Unit.

303.  Youth No. 5 has been subjected to illegal and abusive restraints and a hostile environment at North Central.

304.  For example, on November 27, 2018, Youth No. 5 was walking back to his room after using the bathroom when, according to the YDC compilation report, Youth No. 5 "looked into another resident's room and was immediately confronted by [YDC staff] and told that he was receiving written accountability for looking into another resident's room."

305.  According to the YDC compilation report, as he was walking into his room, Youth No. 5 shrugged in response to being told that he would receive a written accountability.

306.  At that point, four YDC staff members "walked down to resident [Youth No. 5]'s room to address his behavior[.]"

307.  According to the YDC compilation report, when the four YDC staff members entered Youth No. 5's room he was "against his wall."

308.  According to the YDC compilation report, Youth No. 5 was "confronted" about whether he shrugged and denied doing so.

309.  YDC staff then asked Youth No. 5 again if he shrugged and, according to the YDC compilation report, "resident [Youth No. 5] quickly showed signs that he was becoming agitated with staff's confrontation by clinching [sic] his fists and saying that he did shrug [YDC staff] off and stating that he didn't care."

310.  YDC staff continued to provoke Youth No. 5 and escalate the situation.

311.  According to the YDC compilation report, "[YDC staff] moved closer to resident [Youth No. 5] due to him showing signs that he was becoming upset and having his hands clinched [sic] and breathing heavy as soon as [YDC staff] closed proximity resident [Youth No. 5] lunged at [YDC staff]."

312.  According to the YDC compilation report, Youth No. 5 was then physically restrained with involvement by multiple YDC staff.

313.  According to the YDC compilation report, when YDC staff attempted to transition Youth No. 5 from one type of physical hold to another, his head was hit against the floor causing a "small abrasion" above his right eye causing it to bleed.

314.  According to the YDC compilation report, Youth No. 5 was observed to have a laceration measuring approximately one and a half inches above his right eyebrow.

315.  A ChildLine report was made by YDC staff after DRP staff, who were onsite while the abuse occurred, requested that a report be made.

316.  According to the YDC compilation report, Youth No. 5 reported to YDC staff that YDC staff had "slammed his head off the ground."  Youth No. 5 also reported that YDC staff "jumped on his side."  At DRP's prompting, YDC staff made another report to ChildLine as a result of these allegations of abuse.

317.  According to the YDC compilation report, the restraint lasted approximately 40 minutes.

318.  There is no video of this incident.

319.  YDC documentation indicates that an internal "investigation" was completed by Defendant Stuck and a YDC staff member.

320.  By report dated November 30, 2018, Defendant Stuck concluded that the abuse allegations made by Youth No. 5 were "unfounded" because "[a]ll staff statements indicate that the injury [to Youth No. 5] was accidental and [sic] result of [Youth No. 5] struggling with staff [] as he transitioned [Youth No. 5] from the seated upper torso assist to the

side assist.  All staff witness statements indicate that no abusive actions took place during the restraint . . ." The report acknowledged that Youth No. 5 reported that he was abused but concluded that "there is no sufficient evidence to show that any abusive actions occurred on November 27, 2018."  Thus, absent video evidence or an inconsistency in a staff statement, abuse reported by a youth was not going to be believed.

321.  According to the YDC compilation report, on December 5, 2018, Youth No. 5 was escorted by YDC staff to speak to "Trooper Kreamer" about the physical abuse that he suffered on November 27, 2018.  According to the YDC incident compilation report, Resident [Youth No. 5] was in the conference room for just two minutes.

322.  By letter dated December 10, 2018, Defendant DHS notified North Central staff that it deemed Youth No. 5's allegations of abuse to be "unfounded."

323.  YDC staff reported this incident to the judge who determines when Youth No. 5 can be discharged from North Central and Youth No. 5's probation officer.  The description of the incident provided by YDC staff stated that Youth No. 5 "became verbally then physically aggressive with staff" without including YDC staff's provocation of Youth No. 5, his injuries,

or the fact that the entire incident was precipitated by the allegation that Youth No. 5 simply shrugged his shoulders.

324.  This false and/or misleading report was sent to the judge for use in deciding whether and for how long Youth No. 5 must remain at North Central.

325.  This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

326.  Youth No. 5 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at North Central.

327.  Youth No. 5 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at North Central.

328.  Upon information and belief, Youth No. 5 continues to reside in Defendant's hostile environment and is likely to experience illegal and abusive restraints in the future.

**Youth No. 6**

329.  Youth No. 6 was committed to Loysville on April 19, 2017.

330.  Youth No. 6 has a number of disabilities, including bipolar disorder and ADHD.

331.   Youth No. 6 was assigned to STAR Cottage.

332.   Youth No. 6 was subjected to illegal and abusive restraints and a hostile environment at Loysville.

333.   For example, on September 25, 2017, Youth No. 6 was sitting alone at a table with no one else in the room.

334.   According to the AIIRS report, Youth No. 6 was "giving staff in the TV room feedback," the nature of which is unspecified, and a YDC staff member directed Youth No. 6 to remain quiet.

335.   Youth No. 6 allegedly failed to follow that direction, instead saying, "Well, I'm still talking ain't I?  What are you gonna do?  Make me shut up?  I have a mouth to talk.  It's called freedom of speech!"

336.   According to the AIIRS report, Youth No. 6 was told to be quiet.

337.   According to the AIIRS report, Youth No. 6 responded by saying, "What are you going to do?"

338.   According to the AIIRS report, YDC staff told Youth No. 6 that if he did not remain quiet he would be moved to the ICR.

339.   According to the AIIRS report, Youth No. 6 responded "Fine. Let's go!"

340.   According to the AIIRS report, Youth No. 6 "did not get up and walk on his own accord."

69

341.  According to the AIIRS report, YDC staff "attempted to place him in an extended arm assist to escort him to the STAR ICR, but resident [Youth No. 6] quickly resisted the assist and attempted to swing at YDC [staff].

342.  The video of the incident contradicts the YDC incident report compilation.  The video contains no audio.

343.  The video clearly shows Youth No. 6 sitting alone at a table with his arms crossed in front of him.  There was no one else in the room.

344.  Suddenly, one YDC staff member entered the room and walked directly to Youth No. 6's left side as he continued to sit at the table with his arms crossed.  With the assistance of a second YDC staff member who had followed the first into the room, the first YDC staff member immediately tackled Youth No. 6, pushing him off the stool he was sitting on and onto the floor.

345.  The AIIRS report is false and/or misleading and was written in a way to justify the illegal and abusive actions of YDC staff.

346.  The AIIRS report classified the incident as "minor misconduct" and the reason for the restraint as "threat to staff."

347.  According to the AIIRS report, YDC staff reported this incident to Youth No. 6's probation officer.

348.  This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

349.  Youth No. 6 was physically restrained at least 13 times between the time he was admitted to Loysville and September 2017.   Only one of these restraints was available on video.

350.  Youth No. 6 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at Loysville.

351.  Rather than being permitted to participate in regular programming, Youth No. 6 was subjected to seclusion on a number of occasions.

352.  Youth No. 6 has suffered injuries as a result of physical restraints including a cracked lip, jammed finger, abrasions to knee, elbow and hand, ankle pain, mouth pain, swelling around his eye, eyebrow and nose, and headache.

353.  Youth No. 6 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at Loysville.

354.   Upon information and belief, Youth No. 6 continues to reside in Defendant's hostile environment and is likely to experience illegal and abusive restraints in the future.

**Youth No. 7**

355.   Youth No. 7 was committed to Loysville in approximately October 2017.

356.   Upon information and belief, Youth No. 7 has a number of disabilities, including intellectual disability and one or more mental health disabilities.

357.   Youth No. 7 was assigned to the Williams Cottage.

358.   Youth No. 7 has been subjected to illegal and abusive restraints and a hostile environment at Loysville.

359.   For example, on November 7, 2017, YDC staff directed Youth No. 7 "to work on a puzzle to keep himself focused and busy."

360.   According to the AIIRS report, Youth No. 7 "defiantly stated; I'm not working on a puzzle."

361.   According to the AIIRS report, Youth No. 7 was again directed by YDC staff to work on the puzzle using "proximity control and tone, rate and volume in [YDC staff's] voice."  Again, Youth No. 7 declined.

362.   According to the AIIRS report:

72

[YDC Staff No. 1] attempted to use the least restrictive alternative [Safe Crisis Management] technique by utilizing a touch prompt to encourage resident [Youth No. 7] to get up out of his chair and walk to the Hill wide Individual Care Room (ICR). [YDC Staff No. 1] then attempted to use an Extended Arm Assist to move Resident [Youth No. 7] out of his chair.  He initially looked like he was going to get up but then he tried to put his weight back in the chair.  In an attempt to keep him moving towards the door in a Multiple Person Extended Arm Assist, resident [Youth No. 7] hunched down and [YDC Staff No. 2's] momentum put him too far forward and ended up over resident [Youth No. 7]'s back.  Resident [Youth No. 7] fell due to the weight on his back into a prone position.  He immediately was transitioned into a Multiple Supine Assist. Assistance was called and when they arrived [YDC Staff No. 2] was immediately transitioned out of the SCM technique by [YDC Staff No. 3].  [YDC Staff No. 1] controlled his right arm and [YDC Staff No. 4] controlled his left arm and he remained in this position for approximately five minutes.  Resident [Youth no. 7] was able to make a commitment to remain safe and with this commitment, he was transitioned up to his feet and into a Multiple Extended Arm Assist with [YDC Staff No. 3] controlling his left arm and [YDC Staff No. 5].  He was escorted to the Hill wide ICR and upon entering, all SCM techniques were released at this time.

363.   The video of the incident contradicts the AIIRS report.  The video contains no audio.

364.   The video clearly shows Youth No. 7 sitting alone at a table pushed up against a wall with his head in his hand and his other hand on the table.

365.   One YDC staff member stood in close proximity to Youth No. 7. Another YDC staff member was sitting behind the first and at least two other staff members were  standing.  It is not clear how many were interacting with Youth No. 7 and how many were observing.  No other residents are present.

366.   One YDC staff member picked up a small box, which could have been a puzzle.  Another YDC staff member then moved to sit behind Youth No. 7 on the left side and gestured to the third YDC staff member who then moved behind Youth No. 7 on the right side.  At this point, Youth No. 7 was surrounded by three YDC staff members with at least two others observing a few feet away.

367.   Youth No. 7 appeared to remain seated and still the entire time other than moving his head between his hand and laying on his arm on the table.

368.   Then, two YDC staff members tackled Youth No. 7 out of the chair with the assistance of a third YDC staff member, knocking the chair over and knocking Youth No. 7 onto to floor.  As shown in the video, Youth

No. 7 was pushed down primarily by one YDC staff member who had his arms around Youth No. 7's neck and launched himself directly on top of Youth No. 7, laying on his back and head with Youth No. 7 face down on the floor.

369.   Two other staff members are shown immediately rushing on top of Youth No. 7, who was at that point being held down in a prone position by five adult YDC staff.

370.   After more than a minute, the video shows the YDC staff member who was laying on Youth No. 7's back and head stand up and Youth No. 7 turned over onto his back.

371.   Youth No. 7 reported to the YDC nurse that he hit his head during the restraint.

372.   The AIIRS report is false and/or misleading and was written in a way to justify the illegal and abusive actions of YDC staff.

373.   The AIIRS report classified the incident as "minor misconduct" and the reason for the restraint as "physical aggression toward staff."

374.   This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

375.  Youth No. 7 was physically restrained four times between the time he was admitted to Loysville and December 2017.   Only one of these restraints was available on video.

376.  Youth No. 7 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at Loysville.

377.  Youth No. 7 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at Loysville.

**Youth No. 8**

378.  Youth No. 8 was committed to Loysville in approximately July 2018.

379.  Upon information and belief, Youth No. 8 has a number of disabilities, including anxiety disorder.

380.  Youth No. 8 was assigned to the Z.B. Cottage.

381.  Youth No. 8 has been subjected to illegal and abusive restraints and a hostile environment at Loysville.

382.  For example, on August 25, 2018, according to the AIIRS report, YDC staff ("YDC Staff No. 1") "entered the timeout room of ZB

cottage to process with three residents who had been refusing to participate in programming."

383.   According to the AIIRS report, "[YDC Staff No. 1] directed a ZB Resident to leave the room with him so that they could begin processing."

384.   According to the AIIRS report, "[a]t this time, [Youth No. 8] began speaking disrespectfully towards YDC Staff No. 1.

385.   According to the AIIRS report, "[YDC Staff No. 1] confronted resident [Youth No. 8] for this behavior. Instead of correcting his behavior, Resident [Youth No. 8] continued to direct disrespectful remarks towards YDC [Staff No. 1]."

386.   According to the AIIRS report, "[YDC Staff No. 1] used proximity control by walking towards [Youth No. 8] and directed [Youth No. 8] to make a positive decision by correcting his behavior."

387.   According to the AIIRS report, "[w]hen [YDC Staff No. 1] approached [Youth No. 8], [Youth No. 8] stood up out of his chair and faced [YDC Staff No. 1] (0917.22) while making threatening comments."

388.   According to the AIIRS report, "[d]ue to the threats and the Resident standing up abruptly, [YDC Staff No. 1] attempted to physically manage [Youth No. 8]."

389.  According to the AIIRS report, "[w]hen this occurred, [YDC Staff No. 2] who was present in the room radioed for assistance."

390.  According to the YDC incident report compilation, "[a]s soon as [YDC Staff No. 1] engaged, [Youth No. 8] immediately resisted and became combative towards staff."

391.  According to the AIIRS report, "[YDC Staff No. 1] attempted to gain control while [Youth No. 8] resisted violently causing staff and [Youth No. 8] to fall into a wall and then off an adjacent wall.

392.  According to the AIIRS report, "[YDC Staff No. 1] was able to manage the Resident to the floor (0917.28) with the assistance of [YDC Staff No. 2]."

393.  According to the AIIRS report, "[o]nce on the floor, [Youth No. 8] continued to struggle as he was swinging his arms striking [YDC Staff No. 1] and grabbing [YDC Staff No. 1's] clothing."

394.  According to the AIIRS report, "[t]he Resident was able to get to his base and staff were able to manage him back to the floor, landing in the doorway to the stairwell."

395.  According to the AIIRS report, other staff arrived to assist and at 9:21 a.m., [Youth No. 8] was escorted to the ICR.

396.  The video of the incident contradicts the AIIRS report.  The video contains no audio.

397.  The video, which starts at approximately 9:14 a.m., clearly shows Youth No. 8 sitting at a table with two other residents and YDC Staff No. 2. YDC Staff No. 1 did not appear to be present in the room.

398.  All four individuals appeared to be talking calmly and eating breakfast.

399.  At approximately 9:17 a.m., YDC Staff No. 1 appeared to enter the room and another resident stood up and walked toward him.  YDC Staff No. 1 was standing on the opposite side of the room from Youth No. 8.

400.  YDC Staff No. 1 then walked across the room and directly toward Youth No. 8, who remained seated until YDC Staff No. 1 was directly in front of him.

401.  YDC Staff No. 1 approached and raised his hands to approximately waist height as he moved in to grab or push Youth No. 8. Youth No. 8 stood up, with his arms at first at his side as YDC Staff No. 1 pushed, tackled and grabbed Youth No. 8 with force sufficient for Youth No. 8 to hit the wall several feet away.

402.  This resulted in a physical restraint involving a number of YDC staff members that extended out into the stairwell.

79

403.  After the restraint, Youth No. 8 was evaluated by a YDC nurse, who reported a small superficial abrasion on the lateral aspect of his eye and an abrasion on his right shoulder.  Youth No. 8 reported that he hit his head during the restraint.  According to the YDC incident report compilation, photos were taken of the injuries, but they have not been provided.

404.  The AIIRS report is false and/or misleading and was written in a way to justify the illegal and abusive actions of YDC staff.

405.  The AIIRS report classified the incident as "minor misconduct" and "assault on employee" and the reason for the restraint as "physical aggression toward staff."

406.  YDC staff reported this incident to the judge who determines when Youth No. 8 can be discharged from North Central and Youth No. 8's probation officer.  The description of the incident provided by YDC staff created the false impression that Youth No. 8 became upset and ultimately "stood up and challenged a staff to a physical altercation" before he was restrained.  The report submitted by YDC staff did not contain the facts, reflected in the video of the incident, that YDC staff entered the room and immediately started toward Youth No. 8 from across the room and tackled

him to the floor, resulting in a multi-staff restraint causing injuries to Youth No. 8.

407.  This false and/or misleading report was sent to the judge for use in deciding whether and for how long Youth No. 8 must remain at North Central.

408.  This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

409.  Youth No. 8 was physically restrained 10 times between the time he was admitted to Loysville and December 2018.   Only six of these restraints were available on video.

410.  Youth No. 8 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at Loysville.

411.  Youth No. 8 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at Loysville.

**Youth No. 9**

412.  Youth No. 9 has been at South Mountain since May 2018.

413.   Youth No. 9 is diagnosed with a number of disabilities including, bipolar disorder, intermittent explosive disorder, and oppositional defiant disorder.

414.   Youth No. 9 is assigned to the Delta Unit.

415.   Youth No. 9 has been subjected to illegal and abusive restraints and a hostile environment at South Mountain.

416.   For example, on October 16, 2018, Youth No. 9 was punched in the face by YDC staff during an illegal restraint, which resulted in a broken medial orbital wall around his left eye.

417.   According to the compilation report by staff, the incident was captured on video. Despite proper request, Defendants produced no video of the incident as part of DRP's investigation.

418.   The YDC compilation report for the October 16, 2018 incident indicate that, while a group of youth were watching an education video, a YDC Staff member directed Youth No. 9 to stop talking. Youth No. 9 responded by insulting the YDC staff member.

419.   The same YDC staff member "stood up … and began approaching Resident [Youth No. 9]" who, in response, also stood up and clenched his fist once the YDC staff member had reached him.

420.  According to the compilation report, the YDC staff member then restrained Youth No. 9 and "both the resident and staff fell to the unit floor[.]"  Multiple staff then joined the restraint with the first-involved YDC staff member "securing the right arm [of Youth No. 9] while still straddling the resident's torso[.]"  After approximately four minutes, YDC staff transitioned Youth No. 9 to a "Hook Transport Assist" to move Youth No. 9 to his room.

421.  Youth No. 9 passed out during the restraint and according to the YDC compilation report, during transport to his room "[Youth No. 9] put all his weight on to [YDC staff] … and would not lift his feet or walk on his own."

422.  According to the compilation report, once in his room, Youth No. 9 was seen by a YDC nurse, who observed that Youth No. 9 was laying on his back with "[r]apid, shallow breathing[.]"

423.  Upon entering the room and further observation, the nurse observed "a small amount of blood … on his upper lip. Clotting … in [Youth No. 9's] nasal passages. [And] [a] swollen left eye … with discoloration extending to his cheek area."

424.  The YDC nurse observed that Youth No. 9's "speech was initially slurred[.]"

425.  As to Youth No. 9's left eye, the YDC nurse observed that his "left sclera was grayish/purplish, and floating pieces of tissue could be seen [in his eye]."

426.  Youth No. 9 complained of a headache and dizziness.  The YDC nurse attempted to assess Youth No. 9's pupils, however, his "left pupil was unable to be assessed."

427.  In response to questioning by the YDC nurse as to the cause of Youth No. 9's injuries, YDC staff reported that Youth No. 9 was restrained and "possibly could have hit the back of his head."  No explanation was provided for his eye injury.

428.  According to the compilation report, in response to questioning by the YDC nurse as to the cause of his injuries, Youth No. 9 reported he "did not remember everything... but was punched in the face."

429.  Youth No. 9 was taken to the emergency room where he was diagnosed with a fracture in the bone around his left eye.

430.  At the hospital, according to his medical record, Youth No. 9's stated complaint was "physical assault."

431.  A report was made to ChildLine.

432.   Defendant DHS concluded the incident was "unfounded."  YDC records note that Youth No. 9 was interviewed at the hospital; however, Youth No. 9 does not recall speaking to anyone from ChildLine.

433.   Other South Mountain youth reported observing Youth No. 9 being punched in the face by YDC staff during the restraint.  There is no record of whether other residents were interviewed by DHS in connection with the ChildLine investigation.

434.   Youth No. 9 was returned to South Mountain with his eye almost completely swollen shut and required monitoring on a concussion protocol.

435.   After the October 2018 incident, another YDC staff person at South Mountain taunted Youth No. 9, asking: "Do you want to go for round 2?"  This threat caused Youth No. 9 to want to stay in his room.

436.   This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

437.   Youth No. 9 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at South Mountain.

438.   Youth No. 9 suffered physical injury, pain suffering, humiliation, embarrassment and emotional harm that persists to this day due to his experience at South Mountain.

439.   Youth No. 9 continues to reside in Defendant's hostile environment and is likely to experience illegal and abusive restraints in the future.

**Youth No. 10**

440.   Youth No. 10 was committed to North Central on August 15, 2018.

441.   Youth No.10 has, upon information and belief, one or more mental health and/or developmental disabilities.   Youth No. 10 was assigned to the RISE Unit.

442.   Youth No. 10 has been subjected to at least one illegal and abusive restraint and a hostile environment at North Central.

443.   On August 27, 2018, shortly after Youth No. 10 arrived at North Central, according to the YDC compilation report, YDC staff was "addressing the group on some derogatory statements that were made by a resident towards staff.  During the process, resident [Youth No. 10] admitted to the group and staff he did in fact make the comments [sic] staff

addressed this behavior and his continued issues on the dorm and within his peer community."

444.   According to the YDC compilation report, "[d]uring this conversation, resident [Youth No. 10] grew ever increasingly agitated and defiant, and was eventually escorted out of the process [sic] the time was approximately 1735, but during the transport resident [Youth No. 10]attempted to turn towards [YDC staff] who was escorting him in what can only be interpreted as an attempt to free himself or assault [YDC staff]."

445.   According to the YDC compilation report, YDC staff "immediately placed resident [Youth No. 10] against the wall to quell his attempts at an escape from the extended arm or to initiate an assault on staff."

446.   According to the YDC compilation report, "[a]t this time resident [Youth No. 10] became receptive to the verbal prompts of [YDC staff] to calm down and move to his room without issue."

447.   According to the YDC compilation report, YDC staff immediately transported resident [Youth No. 10] to his room and was attempting to have him sit on the bed when resident [Youth No. 10] took a wild swing with a closed fist at [YDC staff]."

448.  According to the YDC compilation report, YDC staff was not struck.

449.  According to the YDC compilation report, YDC staff "immediately placed resident [Youth No. 10] in a shoulder assist" and YDC staff and Youth No. 10 fell to the bed and to the floor with Youth No. 10 landing in the prone position and YDC staff "beside him on the floor."

450.  According to the YDC compilation report, two YDC staff members then physically restrained Youth No. 10.

451.  According to the YDC compilation report, additional YDC staff arrived and transitioned into the restraint while the staff already involved in the restraint transitioned out.

452.  According to the YDC compilation report, during the transitions, "resident [Youth No. 10] attempted numerous times to free himself."

453.  According to the YDC compilation report, the restraint lasted one hour and 25 minutes.

454.  Youth No. 10 reported injuries to his shoulder and reported that his knee "gave out."

455.  There was bruising observed on Youth No. 10's shoulder.

456.  Nursing reported a lump on Youth No. 10's forehead and injuries to his cheek and nose.

457.  Photographs of Youth No. 10 after the restraint show that his lip was split open and his shoulders were bruised and/or had abrasions.

458.  The YDC compilation report classified reason for the restraint as "resident minor misconduct."

459.  According to the YDC compilation report, the next day, Youth No. 10 reported abuse in connection with the physical restraint he endured the night before.

460.  According to the YDC compilation report, Youth No. 10 reported that a particular YDC staff member "had grabbed him out of a chair and threw him up against the wall while in the group room."

461.  According to the YDC compilation report, Youth No. 10 further reported that the same YDC staff person "was yelling at him and saying what are you going to do."

462.  According to the YDC compilation report, Youth No. 10 reported that the YDC staff member "started to poke him in the side of his head while making comments."

463.  According to the YDC compilation report, Youth No. 10 reported that the YDC staff member then knocked him off his chair and restrained him.

464.   This report of abuse triggered an investigation by Defendant Stuck.

465.   The September 7, 2018 investigation report notes that only part of the incident – the part that occurred in the common area – was recorded on video.

466.   Upon information and belief, North Central has since destroyed this video.

467.   The September 7, 2018 investigation report notes that the video and statements from other YDC staff confirmed that a YDC staff member "grabbed resident [Youth No. 10] by the sweatshirt and moved him from his chair in the Rise Unit TV room."

468.   The September 7, 2018 investigation report notes that other YDC staff members confirmed Youth No. 10's report that YDC staff "made derogatory comments and/or challenging comments to resident [Youth No. 10] during the incident."

469.   The September 7, 2018 investigation report notes that the video and statements from other YDC staff confirmed that YDC staff "did poke resident [Youth No. 10] in the head. . ."

470.   The September 7, 2018 investigation report notes that the video and statements from other YDC staff confirmed that the YDC staff member

against whom abuse was reported "positioned resident [Youth No. 10]
facing the glass window of the RISE Unit staff station."

471.  The September 7, 2018 investigation report notes that one staff
member corroborated Youth No. 10's report that YDC staff retrieved a
piece of Youth No. 10's mail and began reading it to him out loud during the
restraint without Youth No. 10's permission.

472.  The RISE Unit Resident Handbook prohibits staff from opening
or reading resident mail "unless reasonable suspicion exists that the
contents may jeopardize the health, safety, or wellbeing of the resident,
employees or the community."

473.  The September 7, 2018 investigation report further notes that
"Resident [Youth No. 10's] statement reports that [YDC staff] used
excessive force when restraining resident [Youth No. 10] in his bedroom on
August 27, 2018.  The staff witness statements do not report any
inappropriate actions during the physical restraint."  There is no video of
this part of the incident.

474.  The September 7, 2018 investigation report notes that the YDC
staff member whose conduct was at issue denied all allegations made by
Youth No. 10.

475.   Based on this "investigation," Defendant Stuck concluded that (a) YDC staff grabbed Youth No. 10 by the sweatshirt and pulled him out of his chair; (b) YDC staff made derogatory and/or challenging comments to Youth No. 10; (c) YDC staff poked Youth No. 10 in the head with his finger; (d) YDC staff positioned Youth No. 10 facing the glass window of the RISE Unit staff station; and (e) that YDC staff read Youth No. 10's mail without his permission.

476.   Based on Defendant Stuck's own investigation, the YDC compilation report of this incident was false in its description of the incident and events leading up to it and it omitted the taunting and provocation of Youth No.10 by YDC staff, the humiliation of Youth No. 10 by YDC staff, and physical abuse inflicted upon Youth No. 10 by YDC staff.

477.   Without the existence of video of the incident or statements from YDC staff corroborating Youth No. 10's reports of abuse in an area in which YDC staff knew there could be no corroborating video, Defendant Stuck discounted without any stated basis Youth No. 10's claim of abuse in his bedroom and did not make an abuse finding, concluding that "there is no clear evidence to indicate that any abusive actions occurred during the restraint that occurred with resident [Youth No. 10] on August 27, 2018 in resident [Youth No. 10's] bedroom."

478.   Defendant Stuck reached this conclusion despite the fact that all other parts of Youth No. 10's abuse complaint were determined to be true and largely verified by the video footage that did exist.

479.   Defendant Stuck reached this conclusion despite the fact that the statement of the YDC staff member accused of abuse was found to be false as it related to the events on video and/or corroborated by other YDC staff.

480.   Despite the clear video evidence, Youth No. 10's statement and documented/photographed injuries, and the statements of other YDC staff, the only "recommendations" by Defendant Stuck as a result of the investigation were as follows: (a) "sufficient evidence exists to indicate *possible* wrongdoing by [YDC staff]" and (b) the YDC staff member charged with misconduct "participate in a pre-disciplinary conference." (emphasis added).

481.   Defendant Stuck reached this conclusion despite the fact that all other parts of Youth No. 10's abuse complaint were determined to be true and largely verified by video footage that does exist.

482.   Defendant Stuck reached this conclusion despite the fact that the statement of the YDC staff member accused of abuse was found to be

false as it related to the events on video and/or corroborated by other YDC staff.

483.  Despite the clear video evidence, Youth No. 10's statement and documented/photographed injuries, and the statements of other YDC staff, the only "recommendations" by Director Defendant Stuck as a result of the investigation were as follows: (a) "sufficient evidence exists to indicate *possible* wrongdoing by [YDC staff]" and (b) the YDC staff member charged with misconduct "participate in a pre-disciplinary conference." (emphasis added).

484.  According to his investigation report, and despite his findings of fact that reveal that Youth No. 10 was grabbed by his sweatshirt and pulled out of his chair and was poked, taunted, humiliated and provoked by YDC staff, at no time did Director Stuck make a determination that Youth No. 10 was abused.

485.  As a result of Youth No. 10's August 28, 2018 report of abuse, a report to ChildLine was made on August 28, 2018.

486.  No report to ChildLine was made on August 27, 2018, despite the fact that abuse took place, injuries were observed and reported by the youth, and there was video confirming abuse.

487.  On or about October 25, 2018, Defendant DHS concluded that Youth No. 10's report of abuse was determined to be "unfounded."

488.  DHS reached this conclusion despite the fact that Defendant Stuck found that Youth No. 10 was grabbed by his sweatshirt and pulled out of his chair and was poked, taunted, humiliated and provoked by YDC staff more than a month before.

489.  By letter to DRP dated March 21, 2019, Defendant Stuck reported that the Pennsylvania State Police filed a charge of harassment against the YDC staff member against whom Youth No. 10 alleged abuse.

490.  In a November 2, 2018 BJJS Court Report, this incident was described without mention of the fact that Youth No. 10 was taunted, provoked and assaulted by YDC staff.  No mention was made of Youth No. 10's allegation of abuse or Defendant Stuck's investigation and findings.

491.  Instead, the November 2, 2018 BJJS Court Report refers to the incident as evidence of Youth No. 10's difficulty adjusting to the rules and expectations of being in placement.

492.  The November 2, 2018 BJJS Court Report states that Youth No. 10 "was confronted by staff for negative feedback to staff and then refused to follow staff directives when directed to return to his room.  Youth

No. 10 was escorted back to his room when he attempted to assault a staff member."

493.   This false and/or misleading report was sent to the judge for use in deciding whether and for how long Youth No. 10 must remain at North Central.

494.   This restraint, and others like it, constitutes illegal physical abuse and were conducted in violation of DHS policy.

495.   Youth No. 10 was not able to receive the necessary treatment and rehabilitation to which he was entitled because of the abuse he suffered at North Central.

496.   Youth No. 10 suffered physical injury, pain, suffering, trauma, humiliation, embarrassment and emotional harm that persists to this day due to his experience at North Central.

**Youth No. 11**

497.   Youth No. 11 was committed to North Central on December 4, 2018.

498.   Youth No. 11 has a number of disabilities, including post-traumatic stress disorder, reactive attachment disorder, ADHD, disruptive mood dysregulation disorder, and cannabis use disorder.  Prior to her

commitment to North Central, she had a history of multiple inpatient

psychiatric admissions and physical and sexual abuse.

499.   Youth No. 11 was assigned to the Honor Unit.

500.   Youth No. 11 has been subjected to illegal and abusive

restraints and a hostile environment at North Central.

501.   For example, according to the Serious Incident Report, on

February 28, 2019, a Youth No. 11's counselor ("YDC Counselor") was

discussing a psychiatric evaluation with Youth No. 11 that Youth No. 11

had participated in the previous week, which was upsetting to her.

502.   According to the Serious Incident Report, Youth No. 11's

"Counselor asked [Youth No. 11] for her thoughts and opinions now that

she had almost a week to process her thoughts.  [Youth No. 11's] thoughts

were much the same as her initial thoughts.  [Youth No. 11] stated that she

was irritated because the psychiatrist asked her the same questions

multiple times, which included 'Do you feel guilty for anything?' and 'What

do you feel responsible for?'"

503.   According to the Serious Incident Report YDC Counselor

continued to press Youth No. 11 about the psychiatric evaluation, even

after Youth No. 11 expressed that she had trouble speaking to the

97

psychiatrist and felt that the information she was seeking was "none of her business."

504.  The Serious Incident Report reflects that YDC Counselor's continued efforts to require Youth No. 11 to discuss the evaluation was upsetting her.

505.  According to the Serious Incident Report, Youth No. 11 "began to tear up her papers in her possession which included her Anger Journal."

506.  According to the Serious Incident Report,

> At this point, with [Youth No. 11] clearly escalating, staff stood up and instructed [Youth No. 11] to move to the group room. [Youth No. 11's] Counselor noticed during the process, [Youth No. 11] was becoming more agitated and wanted the resident to move to an area (where no residents were present) and where there would be less chance for injury should the need for ESPI to be utilized. [Youth No. 11] stood up without issue and seemed as though she was cooperating with staff's directives. However, she did not go to the door that staff told her to go to and that staff were also pointing to. Instead, [Youth No. 11] went out the other door slamming it into the wall in the process. Unfortunately, [Youth No. 11] did not enter the group room as instructed by staff and began walking down the hallway into the dorm's general population. [Youth No. 11]'s Counselor called for [Youth No. 11] to stop however [Youth No. 11] ignore staff's directives and continued to walk away. This caused an unsafe environment for the residents on the dorm as [Youth No. 11]'s behaviors were unpredictable. It was clear that [Youth No. 11] was in an escalated frame of mind while walking away from staff and not adhering to staff's directions. Staff

rapidly closed proximity down the hall, as staff approached [Youth No. 11], she immediately dropped the floor, causing the staff member in pursuit to trip over [Youth No. 11], while landing to the side of her. Staff immediately attempted to place [Youth No. 11] into the least restrictive ESPI. [Youth No. 11] would initially struggle during this intervention, grasping both of her hands tight to her chest, trying to prevent staff from securing her arms. [Youth No. 11] was eventually able to de-escalate and was released of all physical interventions. Staff followed up with her afterwards, but she's reluctant to discuss her issues. Staff will continue to follow up with [Youth No. 11] in hopes that she will use open communication with staff.

507. The video of the incident contradicts the Serious Incident Report. The video contains no audio.

508. The video shows Youth No. 11 sitting in chair in a room with a YDC Counselor. Youth No. 11 was twirling around in the chair while flipping through a composition book. It appeared that she and the YDC Counselor member were speaking to each other.

509. The video shows that during her talk with YDC Counselor, Youth No. 11 began to tear pages out of her composition book while still seated and twirling in her chair. After approximately 10 seconds, YDC Counselor picked up his beverage bottle, unscrewed the lid, and stood up.

510. The video shows Youth No. 11 exited the room and started to walk at a regular pace down the hallway.

511.  The video shows YDC Counselor push in his desk chair, put his beverage down, and follow Youth No. 11 out of the office.

512.  As Youth No. 11 walked down the hallway at a normal pace, YDC Counselor, a larger adult man, came out of the room and began running, charging at Youth No. 11 who was several feet in front of him.

513.  YDC Counselor ran approximately four or five steps toward Youth No. 11.  As YDC Counselor approached Youth No. 11, she turned toward him, appearing to have heard him charging behind her.

514.  YDC Counselor continued toward Youth No. 11 tackling her to ground.

515.  Youth No. 11 landed on her back with her head appearing to hit the floor and slid several feet forward from the momentum of the tackle.

516.  YDC Counselor landed mostly on the floor with one arm on Youth No. 11's neck or shoulder and one arm grabbing both of Youth No. 11's legs.

517.  YDC Counselor quickly moved on top of Youth No. 11 with both arms on or around her neck.

518.  Two other YDC staff members then arrived.

519.  One of the other staff members held Youth No. 11's legs, while the YDC Counselor continued to appear to wrestle her while on top of her.

520.  Although two additional YDC staff members arrived, YDC Counselor continued to restrain Youth No. 11, while the two additional YDC staff members watched.

521.  Upon information and belief, YDC Counselor continued to antagonize Youth No. 11.

522.  A third YDC staff member then laid down on Youth No. 11's legs facing her feet ("YDC Staff No. 1").  YDC Staff No. 1 then grabbed Youth No. 11's face and head with his left hand.

523.  YDC Counselor continued to hold Youth No. 11 with his arms under her arms, pulling her arms behind her back while YDC Staff No. 1 pushed back on her head with his left hand.

524.  YDC Counselor then transitioned out of the restraint as a new YDC staff person arrived and took his place ("YDC Staff No. 2").  The impact cushion was placed under YDC Staff No. 3's knee for comfort.

525.  After YDC Counselor transferred out of the restraint, he remained present watching the restraint continue.

526.  The Serious Incident Report is false and/or misleading and was written in a way to justify the illegal and abusive actions of YDC staff.

527.  This restraint, and others like it, constitute illegal physical abuse and were conducted in violation of DHS policy.

528.  Youth No. 11 was not able to receive the necessary treatment and rehabilitation to which she was entitled because of the abuse she suffered at North Central.

529.  Youth No. 11 suffered physical injury, pain, suffering, humiliation, embarrassment and emotional harm that persists to this day due to her experience at North Central.

**YDC Staff Discourage the Use of Internal Grievance Procedures**

530.  While the YDCs have an internal written grievance process that is supposed to be available to youth, it is a futile process as youth must overcome significant barriers erected by the YDCs formally and informally to deter grievances, and even if a youth files a grievance, it is widely known among the youth that the YDCs do not consider or investigate grievances with fidelity.

531.  To file a grievance, YDC residents must fill out a form and then place it in a specific "grievance box" that is located within the housing unit in common areas in plain sight of staff.

532.  Youth report that grievance forms are not independently available to residents in all units at all YDCs and, instead, must be requested from YDC staff.

533.  Before filing a written grievance, youth at the YDCs are taught to operate through the "chain of command," which requires raising a concern with unit staff, usually the staff member with whom the resident has the grievance, and then a number of additional levels of YDC staff.

534.  For example, at North Central, in the resident handbook for female youth, youth are explicitly "encouraged to first try to resolve the complaint by discussing the matter with the person that may be perceived as the source of the problem."  The manual goes on to describe two additional levels of YDC staff with whom a resident should discuss a complaint with before filing a written grievance.

535.  The resident handbooks for the HOPE, RISE, POWER and FOCUS Units at North Central contain a similar "chain of command" protocol.

536.  Without explaining how a youth could gain access to all six levels in the chain of command, the resident handbook for the POWER and FOCUS Units also states in bold type:

> **The grievance process must <u>ALWAYS</u> follow the chain of command.  The chain of command is not to be circumvented at any time.  The chain of command in the process is:  Unit Supervisor – Manager – Director – Director II – Executive Director – Bureau of Juvenile Justice Services, Deputy Secretary.**

537.   The RISE resident handbook teaches residents that they are "expected to *follow the chain of command*" rather than the "chain of demand," which is described as demanding to see the agency director. Indeed, the RISE handbook makes clear that residents who go outside the "chain of command" by not first speaking to the staff on the unit and then working their way up several additional levels will experience delays in having their issue resolved.  Significantly, RISE residents are told that if they breach the chain of command, the higher-level official will "go back to the person you should have dealt with in the first place (this takes time) to seek information and in most cases will come to the same or very similar decision that dorm staff would have made in the first place.  Just because you may not have liked the answer given to you by your staff does not mean it was not the right answer."

538.   Youth with disabilities at the YDCs report that staff discourage them from complaining about the abuse they suffer by declaring that there will always be a "justification" for the illegal and abusive restraints to which they are subjected, suggesting to the youth that YDC staff will be able to avoid suspicion of abuse by concocting a legitimate basis for a restraint and by telling youth that the YDC is a "hands on program," which is

intended to create and, in fact, does create the impression that youth should expect and accept abuse.

539.   The few youth who filed grievances report that no follow up occurred.  One youth reported that the YDC Manager threw her grievance in the trash.

540.   Many youth with disabilities fear retaliation by staff if they were to report what was happening to them.  Many youth with disabilities report that they felt the grievance process is not effective in addressing their concerns.

541.   This culture at the YDCs, written in policy and implemented in practice, serves to instill in the youth that complaining about abuse will be futile and could result in mistreatment or further abuse.

542.   These policies, practices or procedures at the YDCs serve to make the grievance process unavailable to youth in YDCs.

### YDC Staff Impede Investigation of Abuse of Children with Disabilities

543.   During its investigation of North Central on November 27 and 28, 2018, DRP interviewed and obtained records releases from 25 female youth.

544.   On December 3, 2018, DRP sent Defendant Seabrook a request for the records of the 25 female youth who signed releases.

545.  Beginning on or about December 6, 2018, and at other times, YDC staff, including Defendants Swank, McDonald, Moore, Knittle, Sebastian and John Doe 1-10, directed, intimidated and/or coerced female residents to write letters to DRP rescinding their authorizations for DRP to access their records.

546.  In an effort to impede DRP's investigation by coercing the youth to write letters to DRP rescinding their records authorizations, YDC staff, including Defendants Swank, McDonald, Moore, Knittle and John Doe 1-10, falsely informed the youth that DRP was trying to shut down juvenile placements and that, if successful, the youth would be sent to adult jail.

547.  In an effort to impede DRP's investigation by coercing the youth to write letters to DRP rescinding their records authorizations, YDC staff, including Defendants Swank, McDonald, Moore, Knittle and John Doe 1-10, falsely informed the youth that the releases they signed would result in their records being unsealed and made publicly available.

548.  In an effort to persuade the youth to write letters to DRP rescinding their records authorizations, YDC staff, including Defendants Swank, McDonald, Moore, Knittle and John Doe 1-10, falsely informed the residents that allowing DRP to access their records would not be good for them.

549.   Defendants Swank, McDonald, Moore, Knittle and John Doe 1-10, provided language that the residents should use in writing to DRP.

550.   YDC staff, including Defendants Swank, McDonald, Moore, Knittle, Sebastian and John Doe 1-10, provided the residents with DRP's address.

551.   One of the residents who wrote a rescission letter at YDC staff's direction requested that a YDC staff member sign the letter as a witness with the hope that it would alert DRP to YDC staff's involvement in directing that the letters be written.

552.   Upon information and belief, the YDC staff member who signed the letter is Defendant McDonald.

553.   Another resident who wrote a rescission letter at YDC staff's direction signed her name as a scribble, instead of her usual legible signature, with the hope that it would cause DRP to question the voluntariness of the rescission letter.

554.   Fourteen of the female youth who signed authorizations for DRP to obtain their records wrote to DRP rescinding their releases.

555.   Nine of the 14 letters contain almost identical phrasing, stating that they "do not want to participate" and five of those nine letters reference DRP's use of their "files."  The letters include other common phrases, such

as feeling "manipulated," "taking back my signature," and the idea that DRP would be "suing DHS."

556.   Five of the letters were dated December 6, 2018 – just three days after DRP requested the records – but were not mailed for six or seven weeks.

557.   Notably, although no one at DRP communicated to anyone at DHS or the YDCs that the rescission letters had been received, on February 5, 2019, Kevin Seabrook, Juvenile Justice Facility Director NCSTU - Girls Program, advised DRP he was made aware of the letters.

558.   When asked how he was made aware, Mr. Seabrook stated that he "assumed" through DRP.

559.   On February 20, 2019, in response to further inquiry, Mr. Seabrook advised, "[f]rom my understanding, the residents . . . recanted, due to not wanting their information to be out in the public."  Despite request, Mr. Seabrook did not explain how the female youth were given the impression that their information would be made public.

560.   During DRP's visit to North Central, a number of female residents reported that they had all been "locked down" in their rooms repeatedly and without cause.

561.   North Central unit managers confirmed that the practice existed and was unacceptable and stated that it was being addressed.

562.   Upon information and belief, female residents of North Central reasonably fear being "locked down" in their rooms or facing other forms of retaliation based on providing consent to DRP to review their records or having any other participation or communication with DRP.

563.   YDC staff intimidated, coerced and/or provided false information to the youth committed to the girls' units at North Central into rescinding the permission they gave DRP to review their records.

**COUNT I**
**Plaintiff DRP v. Defendant Miller, in her official capacity**
**Violation of Title II of the Americans with Disabilities Act**

564.   DRP incorporates the allegations of the preceding paragraphs as if fully set forth herein.

565.   DRP's constituents have mental impairments that substantially limit one or more major life activities including, but not limited to, thinking, learning, concentrating, processing, communicating, caring for themselves, and/or interacting with others.  DRP's constituents are persons with disabilities protected by the Americans with Disabilities Act ("ADA").  42 U.S.C. § 12102.

566.   DRP's constituents are youth with disabilities who, with or without reasonable modifications to rules, policies, or practices, are eligible for receipt of rehabilitative, mental health and other services and to participate in the programs and activities of the YDCs, which are operated and administered by DHS. They are, therefore, qualified individuals with a disability within the meaning of the ADA.  42 U.S.C. § 12131(2).

567.  DHS, which is operated and administered by Secretary Miller, is a public entity subject to the requirements of Title II of the ADA.  42 U.S.C. § 12131(1)(B).

568.   Defendant knows or should know in the course of her obligation to provide mental health and other services and evaluations as well as through interaction with OCYF, BJJS, and YDC staff with the youth that many of its residents have disabilities.

569.   Defendant Miller unlawfully discriminates against youth with disabilities by subjecting them to physical abuse in the form of unlawful restraints because of their disabilities or conduct attributable to their disabilities.  42 U.S.C. § 12132; 28 C.F.R. § 35.130.

570.   Defendant Miller unlawfully discriminates against DRP's constituents by denying them equal opportunity to participate in and benefit from the services of the YDCs, including, but not limited to, rehabilitation

services and programs or activities that enable DRP's constituents to be timely and appropriately released.  42 U.S.C. § 12132; 28 C.F.R. § 35.130.

571.  Defendant Miller unlawfully discriminates against DRP's constituents by providing a benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, including, but not limited to, rehabilitation and mental health services and the system through which DRP's constituents can be timely and appropriately released and obtain and maintain privileges and other benefits.

572.  Defendant Miller unlawfully discriminates against DRP's constituents by failing to make reasonable accommodations and/or modifications to YDC policies, practices or procedures as necessary to enable DRP's constituents to equally participate in and/or receive the benefit of services and programs, including, but not limited to, modifying the expected behavioral standards and requirements where a youth's disabilities prevents or inhibits compliance and modifying the standards by which youth can earn privileges and progress to discharge.  42 U.S.C. § 12132; 42 U.S.C. § 12131(2); 28 C.F.R. § 35.130(b)(7).  Secretary Miller is on notice that youth with disabilities need accommodations and/or

modifications by way of actual knowledge and/or because the need is obvious.

573.  Defendant Miller unlawfully discriminates against DRP's constituents by utilizing methods of administration that subject DRP's constituents to discrimination on the basis of their disabilities and have the effect of defeating or substantially impairing and/or defeating accomplishment of the objectives of its publicly-funded YDCs.  42 U.S.C. §12132; 28 C.F.R. § 35.130(b)(3).  Defendant Miller fails to:

a.    Train, supervise, and discipline staff to comply with state law and policy related to use of physical restraints,  to recognize behaviors that are a manifestation of an individual's disability, and to promptly use de-escalation techniques and crisis intervention to prevent or deter illegal abuse;

b.    Assure that the YDCs comply with state law and DHS policy that prohibits illegal and abusive restraints;

c.    Monitor and adequately investigate incidents involving allegations of abuse of youth in her care;

d.    Assure that incidents reported to probation officers and courts are accurate representations of events; and

e.     Assure that the RPRRC exists and functions as required to monitor, review documentation, and provide direction in the reduction of restraints and that it meets no less than quarterly, maintains minutes of the meetings, and makes recommendations to the agency director or designee that will result in preventing illegal restraints.

574.   Defendant Miller unlawfully discriminates against DRP's constituents by creating a hostile environment and subjecting these youth, who are members of a protected class, to unwelcomed harassment, because of their disabilities. The harassment is significantly severe or pervasive and negatively alters the conditions of their environment and treatment. The hostile environment was created by actions of YDC staff acting under DHS authority, apparent authority, or are aided in carrying out the unwelcomed harassment by their position of authority at the YDCs.

575.   Defendant Miller knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

576.   Defendants violate the "integration mandate" of Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d), failing to assure that youth with disabilities can participate and benefit from programs that facilitate discharge, including, but not limited to, level systems and work programs, and are therefore institutionalized longer than necessary.

113

577.   In interfering with the appropriate and timely discharge of youth with disabilities by submitting false and misleading reports to juvenile courts and probation officers, Defendant Miller, in her official capacity and acting or failing to act, unlawfully discriminates against DRP's constituents by unnecessarily prolonging their time in a segregated, institutional setting. 28 C.F.R. § 35.130(d).

### COUNT II
### Plaintiff DRP v. Defendant DHS
### Violation of Section 504 of the Rehabilitation Act

578.   DRP incorporates the allegations of the preceding paragraphs as if fully set forth herein.

579.   DRP's constituents have mental impairments that substantially limit one or more major life activities including, but not limited to, thinking, learning, concentrating, processing, communicating, caring for themselves, and/or interacting with others.  DRP's constituents are persons with disabilities protected by Section 504 of the Rehabilitation Act ("RA").  29 U.S.C. § 705(2)(B).

580.   DRP's constituents are youth with disabilities who, with or without reasonable modifications to rules, policies, or practices, are eligible for receipt of rehabilitative, mental health and other services and to participate in the programs and activities of the YDCs, which are operated

and administered by DHS. They are, therefore, qualified individuals with a disability pursuant to the RA.  28 C.F.R. §§ 41.31 and 41.32.

581.  DHS is a recipient of general federal financial assistance and, as such, is subject to the requirements of Section 504 of the RA.  29 U.S.C. § 794(b).  In addition, the YDCs receive federal financial assistance through Title XX of the Social Security Act and the National School Lunch Program.

582.  Defendant knows or should know in the course of its obligation to provide mental health and other services and evaluations as well as through interaction of OCYF, BJJS, and YDC staff with the youth that many of its residents have disabilities.

583.  Defendant DHS unlawfully discriminates against YDC youth with disabilities by subjecting them to physical abuse in the form of unlawful restraints in violation of DHS policy because of their disabilities or conduct attributable to their disabilities.

584.  Defendant DHS unlawfully discriminates against DRP's constituents by denying them equal opportunity to participate in and benefit from the services of the YDCs, including, but not limited to, rehabilitation services and programs or activities that enable DRP's constituents to be timely and appropriately released.

585.   Defendant DHS unlawfully discriminates against DRP's constituents by providing a benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, including, but not limited to, rehabilitation and mental health services and the system through which DRP's constituents can be timely and appropriately discharged and obtain and maintain privileges and other benefits.   28 C.F.R. § 41.51(b)(1)(i-iii and v), 45 C.F.R. § 84.4(b)(1)(i-iii, and vii) and § 84.52(a).

586.   Defendant DHS unlawfully discriminates against DRP's constituents by failing to make reasonable accommodations and/or modifications to the YDCs policies, practices or procedures as necessary to enable DRP's constituents to equally participate in and/or receive the benefit of services and programs, including, but not limited to, modifying the expected behavioral standards and requirements where a youth's disabilities prevents or inhibits compliance and modifying the standards by which youth can earn privileges and progress to discharge.   28 C.F.R. § 41.53. Secretary Miller is on notice that youth with disabilities need accommodations and/or modifications by way of actual knowledge and/or because the need is obvious.

587. Defendant DHS unlawfully discriminates against DRP's constituents by utilizing methods of administration that subject DRP's constituents to discrimination on the basis of their disabilities and have the effect of defeating or substantially impairing and/or defeating accomplishment of the objectives of its publicly-funded YDCs.  42 U.S.C. §12132; 28 C.F.R. § 35.130(b)(3).  Defendant DHS fails to:

a.     Train, supervise, and discipline staff to comply with state law and policy related to the use of physical restraints, to recognize behaviors that are a manifestation of an individual's disability and to promptly use de-escalation techniques and crisis intervention to prevent or deter illegal abuse;

b.     Assure that the YDCs comply with state law and DHS policy that prohibits illegal and abusive restraints;

c.     Monitor and adequately investigate incidents involving allegations of abuse of youth in her care;

d.     Assure that incidents reported to probation officers and courts are accurate representations of events; and

e.     Assure that the RPRRC exists and functions as required to monitor, review documentation, and provide direction in the reduction of restraints and that it meets no less than quarterly, maintains minutes of the

meetings, and makes recommendations to the agency director or designee that will result in preventing illegal restraints.

588.  Defendant DHS unlawfully discriminates against DRP's constituents by creating a hostile environment and subjecting these youth, who are members of a protected class, to unwelcomed harassment, because of their disabilities.  The harassment is significantly severe or pervasive and negatively alters the conditions of their environment and treatment. The hostile environment was created by actions of YDC staff acting under DHS authority, apparent authority, or are aided in carrying out the unwelcomed harassment by their position of authority at the YDCs.

589.  Defendant DHS knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

590.  In interfering with the appropriate and timely discharge of youth with disabilities by submitting false and misleading reports to juvenile courts and probation officers, Defendant DHS unlawfully discriminates against DRP's constituents by unnecessarily prolonging their time in a segregated, institutional setting.

591.  Defendant DHS fails to assure that youth with disabilities can participate and benefit from programs that facilitate discharge, including,

but not limited to, level systems and work programs, and are therefore institutionalized longer than necessary.

### COUNT III
**Plaintiff DRP v. Defendants Neff, Boyer, Naugle, Stuck, Seabrook and Reed, in their official capacities**
**Violation of the Fourteenth Amendment**

592.   DRP incorporates the allegations of the preceding paragraphs as if fully set forth herein.

593.   Pennsylvania's juvenile justice system is grounded in the concept that juveniles are to be provided with "care, protection, safety and wholesome mental and physical development of children." 42 Pa.C.S. § 6301(b)(1.1). Rehabilitation, not punishment, is the goal of the juvenile justice system.

594.   Youth in Pennsylvania with delinquency adjudications are also entitled to "programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community." 42 Pa.C.S. § 6301(b)(2).

595.   The Fourteenth Amendment to the United States Constitution prohibits the states from depriving any person of life, liberty or property without due process of law.

596.  The policies, practices, and procedures of Defendants Neff, Boyer, Naugle, Stuck, Seabrook, and Reed systemically violate the Fourteenth Amendment guarantee of substantive due process to youth with disabilities at the YDCs.  Such policies, practices, and procedures include the failure to provide youth with disabilities a realistic, meaningful opportunity for rehabilitation and rehabilitative treatment.

597.  Defendants Neff, Boyer, Naugle, Stuck, Seabrook, and Reed in their official capacities, are acting and have acted or failed to act under color of state law.

598.  Defendants Neff, Boyer, Naugle, Stuck, Seabrook, and Reed have knowledge of unlawful restraints and abuse within their programs.

599.  Defendants Neff, Boyer, Naugle, Stuck, Seabrook, and Reed are deliberately indifferent to the fact that the majority of youth placed at the YDCs have disabilities and that abusing them and failing to provide them with a realistic and meaningful opportunity for rehabilitation and rehabilitative treatment will exacerbate their disabilities, cause physical and other injuries, cause their mental health to deteriorate and delay their discharge.  The existence of this problem is known to Defendants Neff, Boyer, Naugle, Stuck and Reed through the incidents described herein and other similar incidents, through the mandated work of the RPRRC, through

internal investigations, and through ChildLine reports and investigations. Defendants Neff, Boyer, Naugle, Stuck, Seabrook and Reed have failed to take reasonable steps to correct the systemic violation of rights to the youth in their care.

600.   Defendants Neff, Boyer, Naugle, Stuck, Seabrook, and Reed have acted with knowledge and deliberate indifference to the violations of the substantive due process rights of youth with disabilities at the YDCs.

601.   As a direct and proximate result of their acts and omissions, the Fourteenth Amendment rights of such youth, through 42 U.S.C. § 1983, have been violated, are being violated and will continue to be violated causing emotional, psychological, and physical harm.

## COUNT IV
**Plaintiff DRP v. Defendants Seabrook, Swank, Knittle, Moore, McDonald, Sebastian and John Does 1-10, in their official capacities Violations of the DD Act and PAIMI Act**

602.   DRP incorporates the allegations of the preceding paragraphs as if fully set forth herein.

603.   DRP has been designated as the protection and advocacy system in Pennsylvania pursuant to the PAIMI and DD Acts.

604.   The PAIMI and DD Acts confer authority on DRP to "pursue administrative, legal, and other appropriate remedies to ensure the

protection of individuals with mental illness who are receiving care or treatment in" Pennsylvania.  42 U.S.C. §§ 10805(a)(1)(B), 15043(a)(2)(A)(i).

605.  The PAIMI and DD Acts confer authority on DRP to obtain records of individuals with, respectively, mental illness and developmental disabilities.  42 U.S.C. §§ 10805(a)(4)(A), 15043(a)(2)(I)(i).

606.  Upon information and belief, each of the 14 female youth who signed authorizations for DRP to access their records and then wrote letters rescinding their authorizations ("14 Female Youth") has mental illness as defined by the PAIMI Act, 42 U.S.C. § 10802(4), and/or has a developmental disability as defined by the DD Act, 42 U.S.C. § 15002(8).

607.  On information and belief, the 14 Female Youth were coerced and/or intimidated into rescinding their authorizations allowing DRP to access their records by Defendants Swank, Knittle, Moore, McDonald, Sebastian and the John Doe Defendants who are staff on the girls' unit at North Central, with the authorization, participation, and/or acquiescence of Defendant Seabrook, the director of the girls' unit at North Central.

608.  The DD and PAIMI Act authorize DRP to investigate abuse and neglect of people with disabilities.  42 U.S.C. §§ 10805(a)(1)(A),

15043(a)(2)(A)(ii).  Access to records is a key tool which DRP uses to pursue such investigations.

609.  Defendants Seabrook, Swank, Knittle, Moore, McDonald, Sebastian and John Does 1-10 unlawfully acted or failed to act under color of state law to deny DRP access to records to which it is entitled under the PAIMI and DD Acts and/or to otherwise interfere with DRP's access authority.

610.  The unlawful conduct of Defendants has impeded DRP's investigation of potential abuse and neglect of youth with disabilities at North Central.

611.  Defendants Swank, Knittle, Moore, McDonald, Sebastian and the John Doe Defendants, under color of state law, interfered with DRP's authority under the DD and PAIMI Acts to conduct a full investigation of abuse and neglect of youth with disabilities at North Central by coercing and/or intimidating the 14 Female Youth to rescind their authorizations to allow DRP to access their records.  Defendant Seabrook, under color of state law, similarly interfered with DRP's investigation authority by authorizing, participating, and/or acquiescing in Defendants Swank, Knittle, Moore, McDonald, Sebastian and the John Doe Defendants' coercion and/or intimidation of the 14 Female Youth, resulting in the purported

rescission of their authorizations to allow DRP to access their records and interference with DRP's authority to conduct a full investigation.

612.   Defendants violated the PAIMI Act, 42 U.S.C. § 10805(a)(1)(A), the DD Act, 42 U.S.C. § 15043(a)(2)(A)(ii), and 42 U.S.C. § 1983.

**WHEREFORE**, DRP respectfully requests that judgment be entered in its favor and against Defendants, together with the following relief:

a.   Exercise jurisdiction over this case;

b.   Issue declaratory relief determining that Defendants' actions and omissions as described above violate the law;

c.   Issue injunctive relief to enjoin Defendants from continuing to violate the law; and

d.   Grant such other relief as may be appropriate, including awarding reasonable attorneys' fees and costs.

DISABILITY RIGHTS PENNSYLVANIA

By:   Kelly Darr (PA I.D. 80909)
Shanon Levin (PA I.D. 86040)
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705
(215) 238-8070
(215) 772-3126 (fax)

124

kdarr@disabilityrightspa.org
slevin@disabilityrightspa.org

Carol Horowitz (PA I.D. 81660)
Andrew Favini (PA I.D. 316339)
429 Fourth Avenue, Suite 701
Pittsburgh, PA 15219-1505
(412) 391-5225
(412) 467-8940 (fax)
chorowitz@disabilityrightspa.org
afavini@disabilityrightspa.org