## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DISABILITY RIGHTS PENNSYLVANIA,** | : | **CIVIL ACTION NO. 1:19-CV-737** |
| | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES**, *et al.*, | : | |
| | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Disability Rights Pennsylvania ("DRP") brings this lawsuit directly and in a representative capacity against defendants Pennsylvania Department of Human Services ("DHS") and several DHS officers and employees. Defendants move to dismiss DRP's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that DRP lacks standing and that it falls outside the relevant statutory zones of interest. We will deny defendants' motion.

## I.    Factual Background & Procedural History

DRP is a nonprofit Pennsylvania corporation that has brought suit on its own behalf and on behalf of its constituents who were allegedly injured while residing in the Commonwealth's Youth Development Centers ("Centers"). (Doc. 1 ¶¶ 1, 19).

Defendants are DHS and various DHS officials and employees.[1] (See id. ¶¶ 20-32). Each individual defendant is named in their official capacity. (See id. ¶¶ 21-32).

## A. Pennsylvania's Youth Development Centers

DHS established residential Centers in 1959. (Id. ¶ 33). DHS, through the Bureau of Juvenile Justice Services, operates the Commonwealth's three Centers: Loysville Youth Development Center, North Central Secure Treatment Unit, and South Mountain Secure Treatment Unit. (Id. ¶ 34). DHS is responsible for the management, operations, program planning, and oversight of these facilities. (Id.)

Center residents are juvenile offenders between the ages of 12 and 21. (Id. ¶ 40). Most Center residents have mental health, developmental, or intellectual disabilities. (Id. ¶ 42). The average resident lives at a Center between six and nine months, (id. ¶ 35), during which time the Center provides them with a variety of different treatments. The Centers specifically offer long-term services and other

---

[1] Named as defendants are Teresa Miller, Secretary of DHS, and Charles Neff, director of DHS's Bureau of Juvenile Justice Services. The other defendants are employees within the Bureau: John Boyer and Jenny Naugle, directors of the Loysville Center; Keith A. Stuck, director of the boys' program at North Central Secure Treatment Unit; Kevin R. Seabrook, director of the girls' program at North Central Secure Treatment Unit; Kristopher Reed, director of South Mountain Secure Treatment Unit; Randell Swank, former Youth Development Counselor Supervisor at North Central Secure Treatment Unit; Ranatta Knittle, former Youth Development Aide Supervisor at North Central Secure Treatment Unit; Veronica Moore, former Youth Development Aide at North Central Secure Treatment Unit; Dorene McDonald, former Youth Development Aide at North Central Secure Treatment Unit; Timothy Sebastian, former Youth Development Counselor Supervisor at North Central Secure Treatment Unit; and John Doe 1-10, employees who "directed, supervised, or participated in influencing, coercing, intimidating, threatening, or retaliating against female residents of North Central Secure Treatment Unit who authorized release of their records to DRP." (See id. ¶¶ 21-32).

tailored programming, like mental health services and drug and alcohol rehabilitation. (Id. ¶ 36). Each Center aims to offer appropriate treatment, reformation, and rehabilitation, (id. ¶ 37), consistent with their statutory obligation to "provide for the care, protection, safety and wholesome mental and physical development of children," (id. ¶ 38 (quoting 42 PA. CONS. STAT. § 6301(b)(1.1)); see also id. ¶ 39). DHS proclaims that all Center residents receive individualized treatment based on their respective strengths and needs. (Id. ¶ 45).

## B.    DRP's Investigation and Alleged Misconduct

The Commonwealth has designated DRP as its protection and advocacy ("P&A") system under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"),[2] 42 U.S.C. §§ 10801-10807, and the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. §§ 15041-15045. (Id. ¶ 19(a)). As a P&A system, DRP is subject to statutory requirements regarding its structure and management. (Id. ¶ 19(b)-(j)). It is also tasked with certain advocacy responsibilities on behalf of individuals with mental illness and intellectual or developmental disabilities. (Id.)

---

[2] Several cases refer to the PAIMI Act's predecessor, the Protection and Advocacy for Mentally Ill Individuals Act of 1986. The Act was renamed to the Protection and Advocacy for Individuals with Mental Illness Act in 2000. See Youth Drug and Mental Health Services Act, Pub. L. No. 106-310, Div. B, § 3206(a), 114 Stat. 1101, 1168, 1193-94 (2000).

### 1. *Investigation into Alleged Abuse by Youth Development Center Staff*

Pursuant to its statutory duties, DRP investigates potential abuse of those with mental illness and intellectual or developmental disabilities. (<u>Id.</u> ¶ 19(c) (citing 42 U.S.C. § 15043(a)(2)(B); 45 C.F.R. § 1386.19; 42 U.S.C. §§ 10801(b)(2)(B), 10805(a)(1)(A)). In or about September 2017, DRP learned of an alleged assault of a resident with a mental illness by staff at the Loysville Center. (<u>Id.</u> ¶ 84). DRP visited the Loysville Center in November 2017 and began an investigation. (<u>Id.</u> ¶ 86). Its employees interviewed residents and reviewed records at the Center, including videos of physical restraints of residents by Center staff. (<u>Id.</u>) It then expanded its investigation to include the Commonwealth's two other Centers. In December 2018, DRP visited the Loysville Center again, in addition to visiting the North Central and South Mountain Centers. (<u>Id.</u> ¶ 87-88). DRP staff interviewed residents at each facility and reviewed various records and documents relating to those facilities. (<u>Id.</u>) DRP diverted resources from its other activities to investigate defendants' alleged misconduct. (<u>Id.</u> ¶ 19(h)).

The investigation revealed the following:

- that "[Center] staff physically restrain youth with disabilities when there is no risk of harm to the youth, staff or others," (<u>id.</u> ¶ 88; <u>see</u> <u>also</u> ¶ 92);

- that "[Center] staff . . . provoke youth with disabilities into self-harming behaviors or other escalated behaviors as a pretext to justify abuse in the form of physical restraint," (<u>id.</u> ¶ 88);

- that staff "unlawfully physically restrain youth as a form of punishment for non-aggressive, minor misconduct," (<u>id.</u> ¶ 89); and

- that Center staff fail to utilize less restrictive techniques before engaging in physical restraints, (id. ¶ 90), and instead use inappropriate restraint techniques that increase the likelihood of pain and injury to residents, (id. ¶ 93; see also ¶¶ 94, 95, 98, 99).

Residents with disabilities suffered injuries as a result of this treatment, (id. ¶ 96), and lived in a hostile environment, (id. ¶¶ 105-16).  In support of these allegations, DRP identifies 11 exemplar Center residents who claim Center staff abused them. (See id. ¶¶ 126-529).

### 2.    *Defendants' Attempts to Impede DRP's Investigation*

DRP maintains that Center staff impeded or attempted to impede its investigation into alleged misconduct at the Centers.  (See id. ¶¶ 543-63).  The complaint specifically charges that Center staff tried to coerce Center residents into rescinding previously-signed records releases that would grant DRP access to the residents' confidential files.  (Id. ¶¶ 543-56).

DRP interviewed and obtained records releases from 25 female residents while investigating the North Central Center in late November 2018.  (Id. ¶ 543). DRP then requested the residents' records from defendant Seabrook.  (Id. ¶ 544). According to DRP, just over a week later, defendants Swank, McDonald, Moore, Knittle, Sebastian, and John Does 1-10 "directed, intimidated and/or coerced female residents to write letters to DRP rescinding their authorizations for DRP to access their records."  (Id. ¶ 545).  DRP alleges that these defendants falsely informed residents that DRP was trying to shut down juvenile placements and that residents would be sent to adult jail if DRP was successful, that the releases would unseal the residents' records and make them publicly available, and that giving DRP access to

the records "would not be good for them." (Id. ¶¶ 546-48).  DRP claims that these

defendants provided residents with DRP's address and standard language to use in

their rescission letters.  (Id. ¶¶ 549, 550; see also id. ¶¶ 551-56).

### C.    Procedural History

DRP filed suit in this court in April 2019 asserting four statutory claims

against the defendants in its own right and on behalf of its constituents.  Defendants

now move to dismiss DRP's complaint.  Defendants' motion is fully briefed and is

ripe for disposition.

## II.    Legal Standard

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a

claim for lack of subject matter jurisdiction.  See FED. R. CIV. P. 12(b)(1).  Such

jurisdictional challenges take of one two forms: (1) parties may levy a "factual"

attack, arguing that one or more of the pleading's factual allegations are untrue,

removing the action from the court's jurisdictional ken; or (2) they may assert a

"facial" challenge, which assumes the veracity of the complaint's allegations but

nonetheless argues that a claim is not within the court's jurisdiction.  Lincoln

Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v.

United States, 535 F.3d 132, 139 (3d Cir. 2008)).  In either instance, it is the plaintiff's

burden to establish jurisdiction.  See Mortensen v. First Fed. Sav. & Loan Ass'n,

549 F.2d 884, 891 (3d Cir. 1977).

## B.    Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the
dismissal of complaints that fail to state a claim upon which relief may be granted.
FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the
court must "accept all factual allegations as true, construe the complaint in the light
most favorable to the plaintiff, and determine whether, under any reasonable
reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County
of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings,
Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the
defendant fair notice of what the . . . claim is and the grounds upon which it rests."
Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,
550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts
a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31
(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a
plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting
Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a
claim must be separated; well-pleaded facts are accepted as true, while mere legal
conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578
F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual
allegations, it must determine whether they are sufficient to show a "plausible claim
for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550
U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## III. <u>Discussion</u>

DRP's complaint advances four counts. Count I asserts a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, *et seq.*, against defendant Miller in her official capacity as DHS Secretary. (Doc. 1 ¶¶ 564-77). Count II alleges that DHS itself violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. (Id. ¶¶ 578-91). Count III alleges that defendants Neff, Boyer, Naugle, Stuck, Seabrook, and Reed violated the Fourteenth Amendment. (Id. ¶¶ 592-601). Finally, Count IV alleges defendants Seabrook, Swank, Knittle, Moore, McDonald, Sebastian, and John Does 1-10 violated both the PAIMI Act, 42 U.S.C. §§ 10801-10807, and the DD Act, 42 U.S.C. §§ 15041-15045. (Id. ¶¶ 602-12). DRP requests a declaratory judgment that defendants' alleged conduct violates the law and an injunction enjoining them from continuing to violate the law. (Id. ¶ 612).

Defendants seek dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants submit that DRP lacks organizational and associational standing. (Doc. 17 at 3-10). They also claim that DRP falls outside of the zone of interests of each statute at issue. (Id. 7-8). We begin with defendants' standing challenge.

### A. Article III Standing

Article III of the United States Constitution limits federal court jurisdiction to "cases" or "controversies." U.S. CONST. art. III, § 2. To establish Article III standing, a plaintiff must demonstrate "(1) an injury in fact, (2) a sufficient causal

connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58 (2014) (internal quotation marks omitted) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).  To avoid impermissibly assessing the merits, a court must "assume for the purposes of [a] standing inquiry that a plaintiff has stated valid legal claims." Cottrell v. Alcon Labs., 874 F.3d 154, 162 (3d Cir. 2017) (citation omitted).  Defendants confine their Article III standing argument to the injury-in-fact requirement.  (See Doc. 17 at 3-10).

A plaintiff sufficiently pleads an injury in fact by claiming "that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. ___, 136 S. Ct. 1540, 1548 (2016), as revised (May 24, 2016) (quoting Lujan, 504 U.S. at 560); Cottrell, 874 F.3d at 162-63 (citation omitted).  A legally protected interest may arise from, *inter alia*, a statute that creates legal rights.  Cottrell, 874 F.3d at 164 (quoting Lujan, 504 U.S. at 576-78).  An injury is particularized when it "affect[s] the plaintiff in a personal and individual way." Spokeo, 136 S. Ct. at 1548 (citation omitted).  A concrete injury is one that "actually exist[s]" and is "real" rather than "abstract," id. at 1548 (citations omitted), and Congress may elevate an intangible harm to a concrete injury for purposes of standing, see In re Horizon Healthcare Servs. Inc. Data Breach Litig. ("*In re* Horizon"), 846 F.3d 625, 637 (3d Cir. 2017) (citing Spokeo, 136 S. Ct. at 1545).  "The injury-in-fact requirement is 'very generous' to claimants." Cottrell, 874 F.3d at 162

(citation omitted).  Plaintiffs need only allege a "specific, identifiable trifle of injury." *In re* Horizon, 846 F.3d at 633 (citation omitted).

Entities may assert two different types of standing: (1) organizational standing (on its own behalf) or (2) associational standing (in a representative capacity).[3]  See Pa. Prison Soc'y v. Cortes, 508 F.3d 156, 162-63 (3d Cir. 2007).  An entity has organizational standing in its own right when the organization itself suffers injuries as a result of a defendant's allegedly unlawful conduct.  Id. at 163 (citing Warth v. Seldin, 422 U.S. 490, 511 (1975); Havens Realty Corp. v. Coleman, 455 U.S. 363, 372-79 (1982); Addiction Specialists, Inc. v. Township of Hampton, 411 F.3d 399, 406-07 (3d Cir. 2005)).  An entity can alternatively have associational standing on behalf of its members or constituents.  Id. (citing Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); NAACP v. Button, 371 U.S. 415, 428 (1963); Pub. Int. Res. Grp. v. Powell Duffryn Terminals, 913 F.2d 64, 70 (3d Cir. 1990)).

### 1. *Organizational Standing*

Defendants argue that DRP does not have organizational standing because the expenditure of "time, money, and resources" to investigate and litigate defendants' conduct is not an injury in fact.  (Doc. 17 at 6-7).  DRP rightly retorts that its reallocation of resources is a cognizable injury.  (Doc. 22 at 15-21).

---

[3] Organizational standing is also often called "direct standing," "personal standing," or "individual standing."

An organization may have standing if it can show a defendant's actions "perceptibly impaired" the organization's ability to provide its primary services or carry out its mission and have resulted in a diversion of resources. See Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 308 (3d Cir. 2014) (quoting Havens, 455 U.S. at 379)[4]; Fair Hous. Rights Ctr. in Se. Pa. v. Post Goldtex GP, LLC, 823 F.3d 209, 214 n.5 (3d Cir. 2016) (citations omitted). In Havens, the Supreme Court held that a fair housing organization had standing because the defendants' unlawful conduct required diversion of resources to counteract the conduct, thereby impairing the organization's ability to provide its other services. Havens, 455 U.S. at 379. Likewise, in Blunt, the Third Circuit held that the plaintiff-organization—a parent group—had standing because it diverted its resources to remedy alleged discrimination. Blunt, 767 F.3d at 312-14; see also Goldtex, 823 F.3d at 214 n.5. It was irrelevant that the organization's mission was to eradicate discrimination in the school district; the relevant question was whether the organization had diverted resources it might use elsewhere. Blunt, 767 F.3d at 312-13. District courts in this circuit have applied this reasoning to hold that DRP's predecessor, Pennsylvania Protection and Advocacy, had standing when it diverted resources to remedy perceived issues with other Commonwealth programs. See, e.g., Pa. Prot. & Advocacy, Inc. v. Houston, 136 F. Supp. 2d 353, 361-63 (E.D. Pa. 2001); Pa. Prot. & Advocacy, Inc. v. Dep't of Pub. Welfare, 1:00-cv-1582, slip op. at 3-4 (M.D. Pa. Mar.

---

[4] Although styled as a concurrence in part, Judge McKee's opinion serves as the majority opinion as it relates to organizational or personal standing. See Blunt, 767 F.3d at 282 n.52; see also id. at 305-14 (McKee, J. concurring in part).

27, 2002); <u>Gaskin v. Pennsylvania</u>, No. 94-4048, 1995 WL 154801, at *5-6 (E.D. Pa. Mar. 30, 1995).

DRP provides a variety of different services and programs for its constituents. (<u>See</u>, <u>e.g.</u>, Doc. 1 ¶ 19(g)). And it has finite resources to provide those services and programs. (<u>Id.</u> ¶ 19(h)). DRP alleges that, in response to defendants' allegedly unlawful conduct, it redirected "time, money, and resources" to investigate alleged abuse at the Centers. (<u>Id.</u>) These efforts diverted staff and resources from providing services and programs to DRP's constituents. (<u>Id.</u>) Viewing the facts in a light most favorable to DRP, we find that DRP has plausibly alleged that its diversion of resources "perceptibly impaired" its ability to provide its services and carry out its mission. <u>See</u> <u>Havens</u>, 455 U.S. at 379.

Defendants arguments to the contrary are without merit. Defendants contend that DRP cannot have organizational standing on the theory that it diverted funds to advocate on its constituents' behalf because its very purpose is to advocate on its constituents' behalf. (Doc. 17 at 6-7). In other words, DRP has not been injured because it would be using its resources for advocacy whether or not it was investigating Center misconduct. It is inconsequential that DRP's mission is to protect against the very type of discrimination it investigated and is now litigating. Indeed, the Third Circuit in <u>Blunt</u> and the Eastern District of Pennsylvania in <u>Houston</u> expressly rejected that argument. <u>See</u> <u>Blunt</u>, 767 F.3d at 312-13; <u>Houston</u>, 136 F. Supp. 2d at 361. The question is not whether the organization is using its resources in furtherance of its mission, but whether the organization had to alter its operations and reroute its resources in response to allegedly unlawful conduct in a

way it otherwise would not have.  <u>Blunt</u>, 767 F.3d at 312; <u>Houston</u>, 136 F. Supp. 2d

at 361.  At this stage, we accept as true DRP's claim that it diverted resources from

other activities to address defendants' alleged discrimination.  (Doc. 1 ¶ 19(h)).  But

for that discrimination, DRP's resources would have been allocated elsewhere.

Defendants also suggest that DRP lacks standing because pursuit of litigation

alone does not create an injury in fact, invoking the Third Circuit's decision in <u>Fair</u>

<u>Housing Council of Suburban Philadelphia v. Montgomery Newspapers</u>, 141 F.3d 71

(3d Cir. 1998).  (Doc. 17 at 7 (citation omitted)).  Defendants are correct to the extent

that litigation expenses alone are insufficient to constitute an injury in fact.  <u>See</u>

<u>Montgomery Newspapers</u>, 141 F.3d at 78-79.  The Third Circuit requires "something

more," <u>id,</u> at 79, namely, a "concrete and demonstrable injury to [the organization's]

activities," <u>id.</u> (quoting <u>Spann v. Colonial Vill., Inc.</u>, 899 F.2d 24 (D.C. Cir. 1990)).

<u>Montgomery Newspapers</u>, however, is factually distinguishable.  There, the

Third Circuit held that a plaintiff-organization lacked standing because there was

no proof at summary judgment that it had altered its operations or diverted its

resources *in response to* allegedly unlawful conduct.  <u>Id.</u> at 78.  Instead, the alleged

injury—costs associated with reviewing advertisements—was simply part of the

organization's normal day-to-day activities.  <u>Id.</u>  That is not the case here.  As

described above, DRP devoted substantial resources to investigating potential

discrimination against its constituents.  That investigation and its associated costs

consequently diverted funds away from other programs and services DRP

ordinarily provides.  These costs are independent of DRP's litigation costs.  DRP

has effectively pled that defendants' allegedly unlawful conduct has affected DRP's

ability to carry out its mission and has thus alleged the "something more" required by <u>Montgomery Newspapers</u>. <u>Id.</u> at 79. We therefore reach the same conclusion as the Third Circuit and other district courts in this circuit in holding that DRP has organizational standing.

### 2. *Associational Standing*

DRP alternatively advances an associational standing theory. Defendants assert that DRP lacks associational standing because the juveniles DRP represents do not possess sufficient "indicia of membership." (Doc. 17 at 8-10). DRP responds that its constituents do possess "indicia of membership" and that its status as a P&A system under the DD Act and PAIMI Act establishes standing. (Doc. 22 at 7-15). We again agree with DRP.

An organization has associational standing on behalf of its constituents when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.</u>, 280 F.3d 278, 283 (3d Cir. 2002) (quoting <u>Hunt</u>, 432 U.S. at 343). Defendants do not argue that DRP has failed to satisfy the <u>Hunt</u> factors. They instead contend that DRP has not met the threshold requirement that its constituents possess the indicia of membership such that it is eligible to maintain associational standing. <u>See</u> <u>Hunt</u>, 432 U.S. at 344-45.

A nonmembership organization may have associational standing if its constituents possess "indicia of membership" in the organization. <u>Pub. Int. Res.</u>

Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 119 (3d Cir. 1997)

(quoting Hunt, 432 U.S. at 344).  In determining whether constituents possess

indicia of membership, courts consult a nonexhaustive list of considerations,

including whether constituents can: (a) elect members of the organization's

governing body; (b) serve on the governing body; and (c) finance the organization's

activities.  See Citizens Coal Council v. Matt Canestrale Contracting, 40 F. Supp. 3d

632, 637 (W.D. Pa. 2014) (citing Hunt, 432 U.S. at 344-45)); id. at 640.

We start by noting that courts are divided as to whether an organization's

status as a P&A system creates sufficient indicia of membership.  The Ninth and

the Eleventh Circuit's hold that P&A systems have associational standing by virtue

of the system's purpose and statutory requirements mandating constituent

participation.  See Or. Advocacy Ctr. v. Mink, 322 F.3d 1101, 1109-12 (9th Cir. 2003);

Doe v. Stincer, 175 F.3d 879, 885-86 (11th Cir. 1999).  These courts find that P&A

systems satisfy the "indicia of membership" test because the system offers a "means

by which [constituents] express their collective views and protect their collective

interests," like a member-based association.  Stincer, 175 F.3d at 886 (quoting Hunt,

432 U.S. at 345); see also Or. Advocacy Ctr., 322 F.3d at 1112 (citation omitted).  The

Eighth and the Fifth Circuits hold that P&A systems do not have associational

standing.  See Mo. Prot. & Advocacy Servs., Inc. v. Carnahan, 499 F.3d 803, 810 (8th

Cir. 2007); Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health &

<u>Mental Retardation Ctr. Bd. of Trs.</u> ("<u>A.R.C.</u>"), 19 F.3d 241, 244 (5th Cir. 1994).[5]

These courts find that P&A system constituents do not have sufficient indicia of

membership because "handicapped and disabled people . . . are unable to

participate in and guide the organization's efforts." <u>A.R.C.</u>, 19 F.3d at 244; <u>see</u> <u>also</u>

<u>Carnahan</u>, 499 F.3d at 810.

    In the absence of guidance from the Third Circuit, we side with the Ninth

and Eleventh Circuits and conclude that DRP has associational standing as a P&A

system.  Those courts point to two aspects of P&A systems that distinguish them

from traditional associations—their statutory purpose and their constituent

involvement.  <u>Mink</u>, 322 F.3d at 1111-12; <u>Stincer</u>, 175 F.3d at 886.  DRP was

established under federal law to protect and advocate for a discrete subset of the

community: individuals with mental illness and intellectual or developmental

disabilities.  (Doc. 1 ¶ 19(b) (citations omitted)).  It therefore furthers the statutes'

purposes of protecting and advocating for a vulnerable segment of the community.

    DRP's constituents are also intimately involved in running the system.  The

PAIMI Act requires that at least 60% of the P&A system's advisory council and the

chair of the council be individuals who "have received or are receiving mental

health services or who are family members of such individuals."  42 U.S.C. §

10805(a)(6)(B), (C).  This advisory council advises the system on its policies and

priorities for protecting and advocating for the rights of those with mental illness.

---

[5] The organization in <u>A.R.C.</u> was a statutorily established and federally
funded organization under 42 U.S.C. § 6042.

Id. § 10805(a)(6)(A).  Also, the P&A system's governing authority must be comprised

of "members who broadly represent or are knowledgeable about the needs of the

clients served by the system."  Id. § 10805(c)(1)(B)(ii).  This governing body is

responsible for the planning, design, implementation, and functioning of the system

and works hand-in-hand with the advisory council to develop the system's

priorities.  Id.  The DD Act similarly mandates constituent participation.  The DD

Act requires that the system's governing board be "composed of members who

broadly represent or are knowledgeable about the needs of the individuals served

by the system."  42 U.S.C. § 15044(a)(1)(A).  A majority of the board's members must

be individuals with disabilities who are eligible for, receive, or have received

services through the system, or individuals closely related to those individuals.  Id.

§ 15044(a)(1)(B).  DRP has alleged that it complies with both statutes' requirements.

(See Doc. 1 ¶ 19(d), (e), (f), (i), (j)).

Yet defendants argue that DRP's constituents lack the requisite indicia of

membership because DRP has not alleged that a Center resident (a) serves on

DRP's advisory council, (b) can elect members of the advisory council, or (c) has a

financial stake in the system.  (Doc. 17 at 9 (citing Hunt, 432 U.S. at 344-45)).  Hunt

concluded that the commission in that case possessed indicia of membership

because its constituents "alone elect the members of the Commission; they alone

may serve on the Commission; [and] they alone finance its activities."  Hunt, 432

U.S. at 344.  But nothing in Hunt suggests that this list of considerations is

exhaustive.  Instead, Hunt set forth a non-exhaustive list of factors that, when

satisfied, suggest an organization has sufficient indicia of membership to permit

associational standing.  See Citizens Coal Council, 40 F. Supp. 3d at 640.  In laying

out those factors, the Hunt Court refused to "exalt form over substance" and

adopted a more malleable standard.  Hunt, 432 U.S. at 345.  The Hunt indicia-of-

membership inquiry is thus merely a means to determine whether an organization

offers its constituents a means to "express their collective views and protect their

collective interests."  Citizens Coal Council, 40 F. Supp. 3d at 640 (citation omitted).

DRP need not establish that individual constituents satisfy each requirement.

Defendants' argument instead echoes the sentiment offered by the Fifth and

Eighth Circuits, which held that the nonmember P&A systems at issue did not have

associational standing because their disabled constituents were incapable of

participating in or guiding the organizations' efforts.  See A.R.C., 19 F.3d at 244;

Carnahan, 499 F.3d at 810.  We, of course, are not bound by out-of-circuit

precedents and we take this opportunity to reject the reasoning in A.R.C. and

Carnahan as inconsistent with the PAIMI Act's and DD Act's statutory mandates.

Both statutes require the involvement of constituents or those who reflect the views

and interests of constituents.  And both statutes require disabled constituents to

serve on the system's governing bodies.  DRP's constituents are able, and in fact

required, to "participate in and guide the organization's efforts."  A.R.C., 19 F.3d at

244.  DRP has alleged as much.  (See, e.g., Doc. 1 ¶ 19(d), (e), (f)).

Consistent with the approach adopted by the Ninth and Eleventh Circuits,

we hold that DRP, as a P&A system, is "sufficiently identified with and subject to

the influence of those it seeks to represent as to have a 'personal stake in the

outcome of the controversy.'"  Mink, 322 F.3d at 1111 (quoting Vill. of Arlington

Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 261 (1977)). Moreover, because of the close relationship between DRP's constituents and the system's operations, DRP "provides the means by which [constituents] express their collective views and protect their collective interests." Stincer, 175 F.3d at 886 (quoting Hunt, 432 U.S. at 345). Lastly, our holding aligns with the panoply of cases concluding that P&A systems have associational standing.[6] We therefore hold that DRP has associational standing to bring suit on behalf of its constituents.

### B.     Zone of Interests

Defendants also claim that DRP does not fall within the relevant statutes' respective "zone[s] of interest." (Doc. 17 at 7-8). They assert that neither a "mere interest in a problem" nor "time, money, and resources" allegedly diverted to a cause brings DRP within the zone of interests. (Id. (citations omitted)). DRP responds that the ADA and the Rehabilitation Act permit suits by organizations—

---

[6] See, e.g., Disability Rights New York v. New York State, No. 17-CV-6965, 2019 WL 2497907, at *8 (E.D.N.Y. June 14, 2019) (citing Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr., 642 F. Supp. 2d 872, 880 (S.D. Ind. 2009); N.J. Prot. & Advocacy, Inc. v. Davy, No. 05-CV-1784, 2005 WL 2416962, at *2 (D.N.J. Sept. 30, 2005); Univ. Legal Servs., Inc. v. St. Elizabeths Hosp., No. 05-CV-585, 2005 WL 3275915, at *5 (D.D.C. July 22, 2005); Risinger v. Concannon, 117 F. Supp. 2d 61, 71 (D. Me. 2000) (citations omitted)); see also, e.g., Tellis v. LeBlanc, No. 18-CV-0541, 2019 WL 1474777, at *3-4 (W.D. La. Apr. 3, 2019); Cmty. Legal Aid Soc'y, Inc. v. Coupe, No. 15-688, 2016 WL 1055741, at *2-3 (D. Del. Mar. 16, 2016); Wilson v. Thomas, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014); Advocacy Ctr. for Elderly & Disabled v. La. Dep't of Health & Hosps., 731 F. Supp. 2d 583, 591-96 (E.D. La. 2010); Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Correction, 642 F. Supp. 2d 872, 877-78 (S.D. Ind. 2009) (collecting cases); Laflamme v. New Horizons, Inc., 605 F. Supp. 2d 378, 395-97 (D. Conn. 2009); N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ., 563 F. Supp. 2d 474, 482-84 (D.N.J. 2008); Liberty Res., Inc. v. Phila. Hous. Auth., 528 F. Supp. 2d 553, 563-64 (E.D. Pa. 2007).

not just individuals with disabilities—and that the DD Act and the PAIMI Act grant P&A systems like DRP statutory authority to pursue legal remedies to protect individuals with mental illness and developmental disabilities. (Doc. 22 at 27-28). We conclude that DRP is within the zone of interests for all four statutes.

A plaintiff may maintain a statutory cause of action only when it "fall[s] within the zone of interests protected by the law invoked."[7] Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129 (2014) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). The zone-of-interests analysis asks whether a particular plaintiff has a claim under a particular statute. See id. at 127-28 & n.4. This analysis requires us to use traditional tools of statutory interpretation to determine whether the relevant statute encompasses the plaintiff's claim. Id. at 127 (citation omitted). The scope of the respective law's zone of interests thus depends on the provision creating its cause of action. Id. at 130 (citation omitted). This test is applied "liberal[ly]" and "is not meant to be especially demanding." Maher Terminals, LLC v. Port Auth. of N.Y. & N.J., 805 F.3d 98, 106 (3d Cir. 2015) (citation omitted).

We turn first to the ADA and the Rehabilitation Act. The ADA provides a statutory right of action to "any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133. The Rehabilitation Act grants relief to "any person aggrieved" by unlawful discrimination. 29 U.S.C. § 794a(a)(2). The Third Circuit

---

[7] The zone-of-interest inquiry is reviewed under the Rule 12(b)(6) standard. See Leyse v. Bank of Am. Nat'l Ass'n, 804 F.3d 316, 320 (3d Cir. 2015) (citing Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 73-74 (3d Cir. 2011)).

has held that, under both the ADA and the Rehabilitation Act, the phrase "any person" includes entities and individuals—it is not limited to "qualified individuals with disabilities." See Addiction Specialists, 411 F.3d at 405. And, under both statutes, a plaintiff is within the zone of interests if they have Article III standing. Id. at 407; McKivitz v. Township of Stowe, 769 F. Supp. 2d 803, 818 (W.D. Pa. 2010) (citations omitted). Because DRP has Article III standing, we conclude that it also falls within the ADA's and Rehabilitation Act's respective zones of interest.

The Third Circuit has not addressed whether P&A systems fall within either the PAIMI Act's or the DD Act's zones of interest. We must therefore look to the statutes to determine their universe of intended plaintiffs. Both acts grant P&A systems the authority to pursue remedies for the protection of individuals they advocate for—either individuals with mental illness or intellectual or developmental disabilities. See 42 U.S.C. § 15043(a)(2)(A)(i); 42 U.S.C. § 10805(a)(1)(B). Both acts also grant P&A systems statutory authority to investigate wrongs committed on their constituents. See 42 U.S.C. § 15043(a)(2)(B); 42 U.S.C. § 10805(a)(1)(A). This grant of statutory power evinces a strong congressional intent to extend the realm of plaintiffs under the acts to the P&A systems they regulate. Given DRP's status as the Commonwealth's P&A system, and the low bar applied in the zone-of-interest context, we conclude that DRP falls within the zone of interests of the PAIMI Act and the DD Act.

## IV.    <u>Conclusion</u>

The court will deny defendants' motion (Doc. 16) to dismiss.  An appropriate

order shall issue.


                                   /S/ CHRISTOPHER C. CONNER
                                   Christopher C. Conner, Chief Judge
                                   United States District Court
                                   Middle District of Pennsylvania


Dated:     March 27, 2020